

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-23-1999

# Walton v. Mental Health Assn

Precedential or Non-Precedential:

Docket 97-2000

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Walton v. Mental Health Assn" (1999). *1999 Decisions.* Paper 44.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/44

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed February 23, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-2000

SANDRA J. WALTON,

        Appellant

v.

MENTAL HEALTH ASSOCIATION OF SOUTHEASTERN
PENNSYLVANIA

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

(D.C. No. 96-cv-05682)
District Judge: Honorable Marjorie O. Rendell

ARGUED OCTOBER 7, 1998

BEFORE: Becker, Chief Judge, Nygaard, and
Noonan,* Circuit Judges.

(Filed February 23, 1999)

        Ronald V. Cole (Argued)
        Suite 2330
        1601 Market Street
        Philadelphia, PA 19103
         Attorney for Appellant

_____

*The Honorable John T. Noonan, Jr., Circuit Judge of the United States
Court of Appeals for the Ninth Circuit, sitting by designation.

          Nancy C. Ryan (Argued)
          Stouffer & Ryan
          1515 Market Street
          Suite 601
          Philadelphia, PA 19102
           Attorney for Appellee

OPINION OF THE COURT

NYGAARD, Circuit Judge,

Appellant, Sandra Walton, was fired by the Mental Health Association of Southeastern Pennsylvania ("MHASP") and sued under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. S 12101 et seq. (1994), claiming harassment, disparate treatment, and failure to accommodate. The District Court granted summary judgment for MHASP on these claims and denied Walton's motion to amend the complaint to add a discrimination claim based on her obesity as a perceived disability. Walton now challenges these decisions. We will affirm.

I.

The facts are generally uncontested and are accurately set forth in the District Court's Memorandum. See Walton v. Mental Health Assoc. of Southeastern Pa., No. CIV.A.96-5682, 1997 WL 717053 (E.D. Pa. Nov. 17, 1997). We will summarize.

Walton worked for MHASP, an advocacy organization for people with mental illness, from January 1990 until she was terminated on January 6, 1994. She was the Director of Advocacy Consumer Training for New Opportunities ("ACT NOW"), a program within MHASP that provided employment training and job placement for mental health services consumers. As Director, Walton was responsible for managing the program and supervising its staff. In 1992, Walton was assigned a new supervisor, Carmen Meek. The relationship between the two was not good.

Like approximately eighty percent of MHASP's employees, Walton is a mental health services consumer. Specifically,

she suffers from depression. As a result, she was hospitalized six times between March 1990 and December 1993. Because of her illness, Walton was absent twenty-one days in 1990, forty days in 1991, fifty days in 1992, and fourteen and a half days in 1993 before taking leave on October 26, 1993. On that date, Walton was hospitalized for her illness, and she did not return to work before she was terminated in January 1994. MHASP policy provides eighteen days of sick leave per year.

For over a year before Walton was terminated, the results of the ACT NOW program -- measured by actual job placement -- had declined significantly. ACT NOW was funded through grants from the Office of Vocational Rehabilitation and the City of Philadelphia. The drop in job placements led MHASP executives to fear for the continued sponsorship and existence of the program.

Upon being hospitalized in October 1993, Walton requested a leave of absence without pay. MHASP's Human Resources Manager granted her request in a letter in which he stated: "In the near future would you please let me know the expected duration of your leave. It is our policy that a leave without pay should not exceed 6 months." Walton wrote MHASP a letter indicating that her doctor did not want her to return to work until November 22 and that she intended to be back on that date. She did not return on that date. On December 30, Walton's doctor wrote MHASP to inform them that Walton had regressed and that she should not return to work for several weeks. On January 4, 1994, Walton notified MHASP that she would report to work on January 10. On January 6, 1994, Walton was terminated. The above facts are undisputed as are all others material to the District Court's summary judgment ruling.

Walton filed a discrimination complaint with the Pennsylvania Human Relations Commission which, in turn, lodged it with the Equal Employment Opportunity Commission. The Human Relations Commission notified Walton that it had found "No Cause" in its investigation of her complaint, and she requested a Right-to-Sue Notice from the EEOC. Walton then sued MHASP.

3

II.

Walton's first claim is that the District Court erred by denying her petition to amend the complaint to add a claim of discrimination based on the perceived disability of obesity. We review the Court's decision for abuse of discretion. See Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990).

When a complaint is not amended within the time that amendments are allowed as a matter of course, a party may amend its complaint "by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Nevertheless, a trial court may consider whether the amendment would be futile. See F.D.I.C. v. Bathgate, 27 F.3d 850, 874 (3d Cir. 1994). Here, the District Court held that Walton's proposed new claim failed to state a claim upon which relief could be granted. See Walton, 1997 WL 717053, at *15.

The ADA defines disability as "A) a physical or mental impairment that substantially limits one or more of the major life activities . . . ; B) a record of such an impairment; or C) being regarded as having such an impairment." 42 U.S.C. S 12102(2). Walton argues that MHASP perceived her as disabled because she is obese, and that this claim, therefore, falls under the third prong of the disability definition.

We have not recognized a cause of action against an employer who discriminates against an employee because it perceives the employee as disabled by obesity. Nor need we do so now because Walton has not claimed that MHASP discriminated against her because it perceived her as disabled by some impairment that substantially limits one of her major life activities.

Although the ADA does not define "major life activities," see Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996), an individual is substantially limited in a major life activity when she is "[u]nable to perform a major life activity that the average person in the general population can perform" or is "[s]ignificantly restricted as to the condition, manner or duration under which [she] can perform a particular

4

major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. S 1630.2(j).

Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. S 1630.2(i). Walton asserts that MHASP did not release a promotional video in which she appeared because she was too obese. She apparently argues that, if MHASP refused to publish the video for this reason, it must have perceived her as substantially limited in her ability to work because appearing in the video was a part of her job. However, "[w]ith respect to the major life activity of working[, t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Id. S 1630.2(j)(3)(i). Furthermore, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." Id.

Even if MHASP did cancel the video because of Walton's appearance (a fact MHASP disputes), her claim fails. By asserting that MHASP prevented her from performing a single minor aspect of her job, Walton simply has not claimed that MHASP perceived her as substantially limited in the major life activity of working under this standard. Nor is there any indication that MHASP perceived her obesity as limiting her other major life activities.

Finally, Walton argues that the District Court first asked her to amend the complaint and then ignored the petition to amend once filed. See Appellant's Brief at 26-27. This is incorrect. The District Court did refer to Walton's delay in petitioning to amend. It did not, however, ignore the petition. Nor did the Court deny the petition because Walton delayed. Rather, the District Court addressed Walton's attempted amendment in the order granting summary judgment. It denied the petition because Walton failed therein to state a claim upon which relief could be granted. Walton was not prejudiced by the Court's decision

5

to deny the petition to amend,1 and the Court did not abuse its discretion.

III.

Walton also appeals the District Court's conclusion that she did not produce sufficient evidence of an objectively hostile work environment to make out a prima facie case of harassment. The ADA states that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . [the] terms, conditions, and privileges of employment." 42 U.S.C. S 12112(a). We have not previously determined whether the ADA creates a cause of action for harassment under this section. The District Court proceeded on the assumption that a claim for a hostile workplace -- i.e., harassment -- could be stated under the ADA, see Walton, 1997 WL 717053, at *12, and the parties on appeal have followed suit.

The Supreme Court has held that language in Title VII that is almost identical to the above language in the ADA creates a cause of action for a hostile work environment. See Patterson v. McLean Credit Union, 491 U.S. 164, 180, 109 S. Ct. 2363, 2374 (1989). In addition, we have recognized that:

> [i]n the context of employment discrimination, the ADA, ADEA and Title VII all serve the same purpose--to prohibit discrimination in employment against members of certain classes. Therefore, it follows that the methods and manner of proof under one statute should inform the standards under the others as well. Indeed, we routinely use Title VII and ADEA caselaw interchangeably, when there is no material difference in the question being addressed.

Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 157 (3d Cir. 1995). This framework indicates that a cause of action for harassment exists under the ADA. However, like other

_____

1. Walton also requested amendment in order to assert a harassment claim. The District Court treated this claim as having been stated in the original complaint. See Part III, infra.

courts,2 we will assume this cause of action without confirming it because Walton did not show that she can state a claim.

A claim for harassment based on disability, like one under Title VII, would require a showing that: 1) Walton is a qualified individual with a disability under the ADA; 2) she was subject to unwelcome harassment; 3) the harassment was based on her disability or a request for an accommodation; 4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and 5) that MHASP knew or should have known of the harassment and failed to take prompt effective remedial action. See McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998); see also Vendetta v. Bell Atlantic Corp., No. CIV.A. 97-4838, 1998 WL 575111, at *9 (E.D. Pa. Sep. 8, 1998).3

_____

2. Many courts have proceeded on the assumption that the ADA creates a cause of action for a hostile work environment but avoided confirming that the claim exists. See, e.g., Wallin v. Minnesota Dept. of Corrections, 153 F.3d 681, 687-88 (8th Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3410 (U.S. Dec. 21, 1998) (No. 98-1007) ("We will assume, without deciding, that such a cause of action exists."); Moritz v. Frontier Airlines, Inc., 147 F.3d 784, 788 (8th Cir. 1998) ("Although we are uncertain whether such a cause of action exists, . . . [plaintiff] has failed to establish a prima facie case of discrimination"); McConathy v. Dr. Pepper/Seven Up Corp., 131 F.3d 558, 563 (5th Cir. 1998) (noting that various district courts have assumed the claim's existence and assuming its existence in order to dispense with appeal but stating that "[t]his case should not be cited for the proposition that the Fifth Circuit recognizes or rejects an ADA cause of action based on hostile environment harassment"). Our District Courts, likewise, have presumed the claim's existence. See, e.g., Vendetta v. Bell Atlantic Corp., No. CIV.A. 97-4838, 1998 WL 575111 (E.D. Pa. Sep. 8, 1998) (noting that because the Supreme Court has read a cause of action for harassment into Title VII, the same is appropriate under the ADA). At least one circuit has considered the claim without disavowing it. See Keever v. City of Middletown, 145 F.3d 809, 813 (6th Cir.), cert. denied, 119 S. Ct. 407 (1998). Indeed, we have not discovered any case holding that the claim cannot be asserted under the ADA.

3. Although the District Court did not mention the fifth element, it correctly found that Walton had failed to meet others, and thus its omission was harmless.

To prove an "abusive work environment" under Title VII, the environment must be shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 22, 114 S. Ct. 367, 371 (1993). Walton would not need to prove that she suffered injury or that her psychological well-being was seriously affected. See id., 114 S. Ct. at 371. She would, however, be called upon to show that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Id. at 21, 114 S. Ct. at 370 (citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405 (1986)). To judge whether such an environment is hostile or abusive, we must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S. Ct. at 371. Walton simply has not demonstrated that the asserted harassment was pervasive or severe enough to meet the Harris standard.

Walton asserts that various comments and actions by her supervisor, Meek, amount to harassment,4 and she argues that the District Court resolved disputed material factual issues to rule on this claim at the summary judgment level. We disagree.

Although it is clear that the relationship between Walton and Meek was poor, Walton has not asserted facts that

_____

4. The primary actions pointed to by Walton are: (1) Meek told Walton that she would be fired if she did not attend the graduation ceremony for ACT NOW (Walton is agoraphobic and later received permission not to attend the graduation from one of Meek's superiors); (2) Meek once told Walton she was "manic-depressive"; (3) Meek called her ten days consecutively when she was first hospitalized, asking each day when she would be returning to work (this upset Walton to the point that her doctor asked her to request that Meek stop calling); (4) Meek stated in her deposition that she believes persons with mental illness have impaired judgment when they are suffering from their illness; and (5) Meek forbade Walton's staff from speaking with her about the ACT NOW program while she was hospitalized.

8

would allow a reasonable jury to find that Meek harassed her because of her disability. See, e.g., Uhl v. Zalk Josephs Fabricators, Inc., 121 F.3d 1133, 1137 (7th Cir. 1997) ("A personality conflict doesn't ripen into an ADA claim simply because one of the parties has a disability."). The fact that Meek's behavior toward Walton may have been offensive does not indicate that it was based on Walton's disability. Finally, we agree with the District Court's conclusion that, "[a]ll of these alleged incidents -- considered both individually and together -- fall far short of meeting the Harris standard." Walton, 1997 WL 717053, at *14.

IV.

Walton's disparate treatment claim asserted that MHASP fired her while she was on leave because of her disability. She now argues that she presented enough evidence to raise an inference of pretext regarding MHASP's stated reason for firing her, and thus to avoid summary judgment. The McDonnell Douglas Title VII burden shifting rules apply to claims of discriminatory treatment under the ADA. See Lawrence v. National Westminster Bank N.J., 98 F.3d 61, 68 & n.7 (3d Cir. 1996). To establish a prima facie case of disparate treatment, Walton "must prove by a preponderance of the evidence that (1) [she] belongs to a protected class; (2) [she] was qualified for the position; (3) [she] was dismissed despite being qualified; and (4) [she] was ultimately replaced by a person sufficiently outside the protected class to create an inference of discrimination." Id. at 68. The District Court assumed that Walton had stated a prima facie case of discrimination under the ADA. 5  See Walton, 1997 WL 717053, at *5.

Once the employee has established a prima facie case, "the burden of production shifts to the employer to `articulate some legitimate, nondiscriminatory reason for the employee's rejection.' " See Fuentes v. Perskie, 32 F.3d

_____

5. MHASP argued that Walton was not "qualified" under the ADA due to her significant absences and therefore could not state a prima facie discrimination claim. The District Court held that whether attendance was essential to the job was a "hotly contested" fact in this case and therefore construed the question in Walton's favor.

9

759, 763 (3d Cir. 1994) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973)). The District Court determined that MHASP had articulated a legitimate, nondiscriminatory reason when it claimed that Walton's failure to provide ACT NOW with the necessary leadership and her extensive absences had led it to fear for the program's future and therefore to dismiss Walton. See Walton, 1997 WL 717053, at *6.

Because MHASP stated a "legitimate, nondiscriminatory" reason for its action, Walton, to defeat summary judgment, had to "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Lawrence, 98 F.3d at 66. These options enable a plaintiff to survive summary judgment, without direct evidence, by producing "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action."6  Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc).

The defendant's intent in dismissing the plaintiff is a factual question. See Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir. 1987) (en banc). Therefore, if Walton can point to evidence that calls into question MHASP's intent, she "raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." Id. A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The District Court concluded that Walton had not offered any evidence from which a reasonable jury couldfind that MHASP's proffered reason for terminating Walton was

_____

6. Of course, at trial, the plaintiff maintains the burden to persuade the jury that the reason was pretextual and that the real reason for the employer's action was discrimination. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 n.4, 113 S. Ct. 2742, 2749 n.4 (1993).

pretextual. See Walton, 1997 WL 717053, at *7–10. Walton argues that she produced both direct and indirect evidence that MHASP's stated reasons were pretextual. She did not, and we will affirm the District Court.

## A. Direct Evidence of Pretext

Walton points to evidence that the high attrition rate in the ACT NOW program, which MHASP claimed showed a declining level of productivity in the program,"had long been known to defendant," Appellant's Brief at 42, and was due to such uncontrollable factors as the program participants' "unreasonable expectations, insubordination, absenteeism and drug abuse." Id. She asserts that she had no control over the attrition rate. This argument is not convincing. MHASP's concern with the program's declining success rate and its reliance on the faltering results in its decision to dismiss Walton was reasonable as long as earlier program participants were faced with similar difficulties. Walton did not claim that they were not.

Walton notes that it was Meek who pointed out numerous faults in the program and claims that her veracity is in doubt because she is the person who purportedly harassed Walton. However, MHASP's knowledge of ACT NOW's faltering results and of Walton's significant absences did not depend on Meek's reports, and Walton has not suggested that the data MHASP relied upon was incorrect.[7]

## B. Indirect Evidence of Pretext

Walton asserts that the timing and circumstances surrounding her dismissal are sufficient to support an inference that MHASP's stated reasons for terminating her are pretextual. Factors including "the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." Josey v. John R. Hollingsworth Co., 996 F.2d 632, 638–39 (3d Cir. 1993).

_____

7. Walton's assertion that MHASP cannot claim that it fired her for her absences because her absences were largely a result of MHASP's abusive treatment is unsupported by the facts. See Part III, supra.

11

Walton cites White v. Westinghouse Electric Co., 862 F.2d 56 (3d Cir. 1989), for authority that the circumstances surrounding her discharge may be sufficient to raise a genuine issue of material fact and preclude summary judgment. White was dismissed when he was three months short of serving thirty years, upon which he would have been entitled to greater retirement benefits and the option to retire at a younger age. We decided that these circumstances indicated that White was discriminated against based on his age. However, the rationale behind White was rejected by the Supreme Court in Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct. 1701 (1993). In Hazen, the Court considered a claim under the ADEA by an employee who had been fired just before his pension would have vested. In holding that the employer did not violate the ADEA by firing the employee to prevent his pension from vesting, the Court emphasized that a firing that may be wrongful in one sense (to purposefully avoid paying benefits, for example) is not necessarily wrongful under the ADEA (or, in Walton's case, the ADA) "unless the protected trait actually motivates the employer's decision." Id. at 610, 611–12, 113 S. Ct. at 1706, 1707–08. Therefore, our inference in White that a wrongful firing that occurred because an employee was about to gain increased pension benefits indicated a wrongful firing based on age was unfounded. Hazen teaches that we must not infer a particular type of discrimination from circumstances that merely indicate a wrongful firing of some sort. That is just what Walton is asking us to do.

To consider timing and/or employee treatment in relation to a dismissal as evidence of discrimination, there must be some logical connection between the timing or treatment and the possibility of the particular discrimination at issue. For example, in Josey, 996 F.2d at 632, a company owned by seven white shareholder employees adopted a new preference for hiring and maintaining shareholders in the midst of unrest following the promotion of a black nonshareholder supervisor ahead of a white shareholder. We found that the timing of the adoption of the new company policy preferring shareholders, together with facts that indicated racial prejudice by at least one shareholder,

12

was sufficient to create an issue of fact as to whether the action was racially motivated. See id. at 640-41.

Walton asserts that MHASP's hiring of her replacement a month before she was notified that she had beenfired showed that the reasons it gave for her dismissal were pretextual. Although she was fired while on leave and was not given notice that she had been replaced until she was about to return to work, it would be wrong to infer from this that MHASP's decision to dismiss her was based on her disability. Here, nothing connects the timing of the dismissal or the related circumstances with a discriminatory motive. Rather, the reverse is true. Walton was let go during her longest extended absence. This would clearly have brought any concerns that MHASP previously had regarding her ability to do her job to a head and increased the pressure on the association to replace her.

V.

Finally, Walton argues that the District Court erred by holding that her proposed accommodation (being left on extended leave) created an undue burden on MHASP. Under the ADA, discrimination includes: "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless[the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such [employer]." 42 U.S.C. S 12112(b)(5)(A). An undue hardship entails "significant difficulty or expense in, or resulting from, the provision of the accommodation." 29 C.F.R. S 1630, App. S 1630.2(p).

The circuits disagree whether the burdens of production and persuasion on the issues of reasonable accommodation and undue burden are properly placed on the plaintiff or the defendant, or are divided between them. See Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 136-37 (2d Cir. 1995) (recounting the various approaches). We now, like the

District Court, "chart a middle course," id. at 137, and adopt the Borkowski approach:[8]

> First, the plaintiff bears the burden of proving that she is otherwise qualified; if an accommodation is needed, the plaintiff must show, as part of her burden of persuasion, that an effective accommodation exists that would render her otherwise qualified. On the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits. These two requirements placed on the plaintiff will permit district courts to grant summary judgments for defendants in cases in which the plaintiff 's proposal is either clearly ineffective or outlandishly costly.

Id. at 139.

Following a prima facie showing by the plaintiff that a reasonable accommodation exists which would make her qualified, the burden shifts to the defendant to prove either that the accommodation is unreasonable or that it creates an undue hardship for the defendant. See id. at 138. These two options before the defendant effectively "merge" because "in practice meeting the burden of nonpersuasion on the reasonableness of the accommodation and demonstrating that the accommodation imposes an undue hardship amount to the same thing." Id.

This distribution of burdens is both fair and efficient. The employee knows whether her disability can be accommodated in a manner that will allow her to successfully perform her job. The employer, however, holds the information necessary to determine whether the proposed accommodation will create an undue burden for it. See id. at 137. Thus, the approach simply places the burden on the party holding the evidence with respect to the particular issue.

Walton asserts that MHASP should have accommodated

_____

8. We previously indicated, in dictum, our preference for the Borkowski approach. See Shiring v. Runyon, 90 F.3d 827 (3d Cir. 1996) (a case under the Rehabilitation Act).

14

her by continuing her leave of absence without firing her.9
The District Court concluded that Walton had made a facial
showing that unpaid leave was potentially a reasonable
accommodation for her sickness by introducing the letter
with which MHASP accepted her request for unpaid leave.
See Walton, 1997 WL 717053, at *11. Addressing MHASP's
decision to end its grant of unpaid leave, however, the
Court reasoned that the "same evidence that demonstrates
the legitimate, nondiscriminatory reason for firing plaintiff
. . . also demonstrates that the accommodation that
plaintiff seeks [continuation of her leave] created an undue
burden for the organization." Id. at *12. Therefore, the
Court held, MHASP had produced "sufficient
uncontroverted evidence to meet the burden of
demonstrating that the requested accommodation, although
possible, was not reasonable." Id.

We will affirm because Walton's requested
accommodation -- continued leave -- would have created

_____

9. Walton originally alleged that MHASP failed to reasonably
accommodate her on a number of other occasions. She raises only this
instance on appeal.

In addition, she now argues that she could have been rehired "in a less
critical position than Director." In her reply brief, Walton further
extends
this argument by asserting that, because MHASP hired her replacement
without telling her, it failed to make a "good faith effort to communicate
with her regarding necessary and available accommodations."

MHASP responds that this argument is untimely because it was not
asserted by the plaintiff before the District Court. Walton originally
complained that "[d]efendant failed to reasonably accommodate
plaintiff 's request for a leave of absence without pay by violating its
own
stated policy respecting the duration of such absences." (The proposed
amended complaint did not alter this claim.) The District Court declined
to consider the reassignment issue because Walton did not raise the
issue in her complaint. See Walton, 1997 WL 717053, at *10 n.12. This
was not in error.

As to Walton's attempt to raise the issue before us,"absent exceptional
circumstances, an issue not raised in the district court will not be heard
on appeal." Altman v. Altman, 653 F.2d 755, 758 (3d Cir. 1981) (citation
omitted). In exceptional circumstances or when manifest injustice would
otherwise result, public interest can require that the issue be heard. See
id. This case does not present such circumstances.

15

an undue burden on MHASP. Reasonable accommodations are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. S 1630.2(o)(1)(ii). Although unpaid leave supplementing regular sick and personal days might, under other facts, represent a reasonable accommodation, an employer does not have to allow leave of this type to the extent that MHASP had already granted it to Walton. A blanket requirement that an employer allow such leave is beyond the scope of the ADA when the absent employee simply will not be performing the essential functions of her position.

Walton attempts to use MHASP's past grants of unpaid leave against it by arguing that these instances show that the leave was a reasonable accommodation. Here, Holbrook v. City of Alpharetta, Georgia, 112 F.3d 1522 (11th Cir. 1997), is informative. In Holbrook, the city accommodated a visually-impaired police detective for a significant period of time with respect to essential functions of his job which he could not perform without assistance. The court held that the city's decision to cease the accommodations did not violate the ADA because the city's original accommodations exceeded the level that the law required. See id. at 1528. Similarly, the unpaid leave granted to Walton exceeded the requirement of reasonable accommodation under the ADA, and MHASP's decision to discontinue the accommodation does not give her a cause of action against it.

VI.

In sum, Walton has not convinced us that the District Court erred by granting MHASP's motion for summary judgment on her claims of harassment, disparate treatment, and failure to accommodate. Nor has she shown that the District Court erred by not allowing her to amend her complaint. Accordingly, we will affirm.

16

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

17