

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-9-2001

# Skerski v. Time Warner Cable

Precedential or Non-Precedential:

Docket 00-3199

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Skerski v. Time Warner Cable" (2001). *2001 Decisions.* Paper 150.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/150

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 9, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3199

LARRY S. SKERSKI,
        Appellant

v.

TIME WARNER CABLE COMPANY, a Division of TIME
WARNER ENTERTAINMENT COMPANY , L.P., aka TIME
WARNER NEWHOUSE ANNEX CORPORATION, aka
TWE-ADVANCE/NEWHOUSE

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 98-cv-00341)
District Judge: Hon. Donetta W. Ambrose

Argued January 8, 2001

Before: SLOVITER, ROTH, and RENDELL,
Circuit Judges

(Filed: July 9, 2001)

William A. Penrod
Susan A. Meredith (Argued)
Caroselli, Beachler, McTier nan
 & Conboy
Pittsburgh, PA 15222

 Attorneys for Appellant

William G. Merchant (Argued)
Papernick & Gefsky
Monroeville, PA l5l46

 Attorney for Appellee

OPINION OF THE COURT

SLOVITER, Circuit Judge.

Appellant Larry S. Skerski filed suit in the United States District Court for the Western District of Pennsylvania against his former employer Time W arner Cable Co., alleging discrimination on the basis of a disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. S 12101 et seq. The District Court granted Time Warner's motion for summary judgment and Skerski appeals.

I.

At all times relevant to this action, appellee Time Warner and its predecessor in interest operated a television cable franchise in the Coraopolis/Moon Township ar ea of Western Pennsylvania. Time Warner's predecessor, New Channels,1 hired Skerski in 1982 to upgrade cable converters in customers' homes. Several months later , Skerski was trained and began working as a cable service technician to install and disconnect cable television service for customers. As part of his job as an installer technician, Skerski serviced cable wires at aerial cable plants (hereafter

---

1. Time Warner refers to this company as "New Channels" whereas Skerski refers to it as "Astro Cablevision" or "Newhouse Annex Corporation." We shall refer to it as"New Channels."

referred to as "overhead work") and underground plants (hereafter referred to as "underground work").2 Performing the overhead work required Skerski to climb ladders, poles, and towers, and work at heights. In his deposition testimony, Skerski first asserted that "ther e was more underground [work] than over head [work]," app. at 352, but he later agreed that approximately 50% of his job required climbing, app. at 41-42. The written description of Skerski's job prepared by New Channels included"repetitive . . . pole climbing . . . and ladder climbing" among the"Physical Tasks." App. at 143.

In May 1993, more than 10 years after he began working as an installer technician at New Channels, Skerski began experiencing dizziness, nausea, and irregular heartbeats while working at heights. In June 1993, Skerski was examined by Dr. Stephen G. Brodsky and was diagnosed as having a panic and anxiety disorder associated with premature ventricular contractions of the heart. Dr. Brodsky referred Skerski to Dr . Stuart L. Steinberg, a psychologist, for his panic condition. Dr. Steinberg recommended that Skerski cease climbing ladders and poles, and otherwise working at heights.

Upon learning of Dr. Steinberg's diagnosis, Skerski's supervisor at New Channels, David Kane, modified Skerski's schedule so as to permit him to continue working as an installer technician. Thus, New Channels limited Skerski's assignments to underground work. The assignments were distributed each day at Kane's direction. Skerski continued to perform under this"modified arrangement," app. at 361, after New Channels was acquired by Time Warner in March 1995, and until January 1997.

Under Time Warner, Skerski's job effectively remained the same. Time Warner's written description of Skerski's position listed the nine essential functions as:

_____

2. There are occasional refer ences in the briefs and in the Appendix to "ground work" as well, but there is no attempt to distinguish such work from "underground work." We assume there is no difference, but if there is, it is clear that neither form of work involves climbing. For our purposes, we will simply discuss "undergr ound work."

1. Conducts CLI testing and repairs, checks amplifier levels in the feeder system for signal quality, and handles routine plant maintenance.

2. Performs FSM calibration and r epairs system problems (i.e., power supplies, active and passive devices and cable).

3. Responds to and completes subscriber technical service calls. Repairs include, but are not limited to: drop wiring, matching xformers, converter replacement, and TV fine tuning.

4. Repairs and replaces strand, lashing, pole line transfers and general construction.

5. Installs new trunk, feeder cables, and associated hardware.

6. Installs and maintains subscriber contr ol and distribution system for multi-subscriber systems.

7. Maintains and stocks necessary materials and tools for company vehicle.

8. Records data on system equipment and operation/services and accurately completes all paperwork as assigned.

9. Recognizes, practices, and enforces safety rules and procedures when performing technical tasks.

App. at 145-146. Each essential function described aspects of that function. One of the four aspects under the fourth essential function was "[m]ay climb poles to perform line transfers." App. at 145. The position description also included "climbing" within the "Special Skills, Knowledges and Abilities" section. As in the New Channels' description, the "Physical Requirements" section included "[c]limbing on ladders, telephone poles, and/or towers." App. at 147.

At some point in 1995, Kane resigned due to poor health and was temporarily replaced by Donna Gruseck before Time Warner hired Richar d Hanning in the fall of 1996 to serve as technical operations manager. In that position, Hanning was Skerski's immediate supervisor. In October 1996, Hanning gave Skerski a below-standard per formance

4

review because of his inability to climb. Time Warner concedes that otherwise "Skerski's performance was superior." Br. of Appellee at 8. However, at that time Hanning told Skerski that Time Warner could not permit him to continue working on his modified no-climbing schedule. According to Skerski, this was the first time since the onset of his panic and anxiety disorder in 1993 that anyone at either New Channels or Time Warner had demanded that he climb.

Skerski described the conversation in his deposition. He testified that he told Hanning that he could continue to climb "with an accommodation," and asked if he "could have a bucket truck," which he had used before successfully, even after his panic disorder was diagnosed. App. at 83. Hanning responded that Time Warner didn't have any bucket trucks to give him, but Skerski believed it did have an extra bucket truck, which he referred to as "an older one." App. at 84. Skerski said that he asked Hanning that he be permitted to continue with his underground work but that Hanning responded, " `You need to be 100 percent.' He said Time Warner will not accommodate me, nor do they have to." App. at 85.

At about this time, Time Warner offered Skerski the opportunity to complete a 90-day training program to allow him to re-acquire the climbing skills necessary to continue in his job as a technician. In a performance review memo dated October 28, 1996, Hanning wrote that "[f]ailure to successfully complete [the 90-day program] and the interim goals will lead to additional disciplinary action up to and including termination." App. at 156.

Skerski attempted, but was unable to complete the training program. He repeatedly complained, "I can't be doing this" because of his anxiety disorder . App. at 388. Dr. Steinberg, who had continued to treat Skerski, sent a letter dated November 21, 1996 reinforcing his prior medical opinion that, inter alia, "[t]he fear of panic attacks is incapacitating and interferes with [Skerski's] work and his private life." App. at 150. Time Warner then stopped the training program without explanation.

It was Time Warner's intention to terminate Skerski's employment as an installer technician in light of his

5

continued inability to climb. It did, however , offer him as an alternative to termination a newly-cr eated warehouse position that paid considerably less than the technician position -- $12.50 per hour in the warehouse compared to the $19.45 per hour he had received as a technician. This may have been in response to Skerski's letter dated November 24, 1996, expressing his inter est in a newly-created position in the warehouse, although Skerski made clear in that letter that he preferred to continue working in the same capacity as he had worked in the pr evious three years. At the end of January 1997, Skerski accepted the warehouse position but stated in his deposition that he did so "only under duress," as Time W arner "[was] threatening [him] with termination." App. at 92.

Shortly after beginning the warehouse position in early February 1997, a position for which Skerski claims he "didn't have the skills," app. at 92, he injur ed his back while lifting and carrying heavy material. Skerski has not returned to work since then, having developed severe lower back pain. He has received workers' compensation benefits based on his salary as an installer technician.

Skerski commenced this civil action under the Americans with Disabilities Act in February 1998, seeking to r ecover money damages from Time War ner and reinstatement to his "modified duty status" as an installer technician. App. at 13. The District Court granted Time W arner's motion for summary judgment on January 27, 2000.  See Skerski v. Time Warner Cable Co., No. 98-341 (W.D. Pa. Jan. 27, 2000). The court determined that there is a genuine issue of material fact as to whether Skerski is "disabled" and acknowledged Time Warner's concession that there is a genuine issue of material fact as to whether he suf fered "an otherwise adverse employment decision" under the ADA. Nonetheless it granted summary judgment to T ime Warner because it found that climbing was an essential function of the installer technician's job that Skerski could not perform and that the transfer to a warehouse position was a reasonable accommodation. Accordingly, the District Court determined that Skerski failed to set forth sufficient evidence to establish a prima facie case under the ADA.

6

Skerski timely filed a notice of appeal. The District Court exercised subject matter jurisdiction over Skerski's ADA claim pursuant to 28 U.S.C. S 1331 and we have appellate jurisdiction over the District Court's grant of summary judgment pursuant to 28 U.S.C. S 1291.

II.

Summary judgment is appropriate where"there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, a court must draw all reasonable inferences from the underlying facts in the light most favorable to the non-moving party. See Battaglia v. McKendry, 233 F.3d 720, 722 (3d Cir. 2000). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. See Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 743 (3d Cir. 1996). Once the moving party has met this initial burden, the non-moving party must present concrete evidence that supports each essential element of its claim. See id. A district court's grant of summary judgment is subject to plenary review. See Pittston Co. Ultramar Am. Ltd. v. Allianz Ins. Co. , 124 F.3d 508, 515 (3d Cir. 1997).

The Americans with Disabilities Act prohibits employers from discriminating based upon the known physical or mental impairments of "a qualified individual with a disability." 42 U.S.C. S 12112. To make out a prima facie case under the ADA, a plaintiff must establish that s/he (1) has a "disability," (2) is a "qualified individual," and (3) has suffered an "adverse employment decision" as a result of that disability. Deane v. Pocono Med. Ctr ., 142 F.3d 138, 142 (3d Cir. 1998) (en banc). The District Court found that there were disputed issues of material fact with regard to the first and third prongs of this test, but relied on the second prong for its judgment. The court deter mined that as a matter of law Skerski is not a "qualified individual" under the ADA, and therefore held that he had failed to set forth a prima facie case of discrimination that could survive Time Warner's motion for summary judgment.

7

Under the ADA, a "qualified individual" is one "who, with or without reasonable accommodation, can per form the essential functions of the employment position that such individual holds or desires." 42 U.S.C.S 12111(8). To satisfy this requirement, a plaintiff mustfirst demonstrate that s/he "satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." Deane, 142 F.3d at 145. Second, a plaintiff must establish that s/he, "with or without reasonable accommodation, can per form the essential functions of the position held or sought." Id. There is no dispute as to the first part of this analysis as Time Warner readily concedes that Skerski was an experienced installer technician. Rather, the issues in the instant case revolve around the latter question.

Turning our attention to this second question requires us to conduct another two-part inquiry. First, we must determine whether Skerski can perfor m the essential functions of his job without accommodation. If this is the case, we will consider him a "qualified individual," thereby satisfying the second part of a prima facie case under the ADA. If Skerski cannot perform the essential functions of his job as an installer technician without accommodation, we must then inquire whether he can per form those same functions with a reasonable accommodation. Again, if he can do so, he will be considered a "qualified individual" under the ADA. See id. at 146. If we determine that genuine issues of material fact exist as to whether Skerski is a "qualified individual" under the ADA, we must reverse the District Court's grant of summary judgment to T ime Warner and remand the case for trial.

A.

Climbing as an "Essential Function"

Skerski first argues that the District Court erred in determining that climbing is an essential function of his job as an installer technician as a matter of law. He contends that, at the very least, there is a genuine issue of material fact as to whether climbing is essential which should be reserved for a jury.

8

We look first to the relevant agency regulations to determine whether climbing is an essential function of Skerski's job as an installer technician. A job's "essential functions" are defined in 29 C.F.R.S 1630.2(n)(1) as those that are "fundamental," not "marginal." The regulations list several factors for consideration in distinguishing the fundamental job functions from the marginal job functions, including: (1) whether the performance of the function is "the reason the position exists;" (2) whether there are a "limited number of employees available among whom the performance of that job function can be distributed;" and (3) whether the function is "highly specialized so that the incumbent in the position is hired for his or her expertise." 29 C.F.R. S 1630.2(n)(2). The regulations further set forth a non-exhaustive list of seven examples of evidence that are designed to assist a court in identifying the "essential functions" of a job. They include:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job performing the function;
>
> (iv) The consequences of not requiring the incumbent to perform the function;
>
> (v) The terms of a collective bargaining agreement;
>
> (vi) The work experience of past incumbents in the jobs; and/or
>
> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. S 1630.2(n)(3).

As is apparent, "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis." EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F .R. pt. 1630, App. 1630.2(n) (2000) [hereafter "EEOC Interpretive Guidance"]. It follows that none of the factors nor any of the evidentiary examples alone are necessarily dispositive.

9

See Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997).

In granting summary judgment, the District Court stated that "reasonable jurors could onlyfind that climbing is an essential element of the installer technician position." Skerski, slip op. at 7. Referring to the r egulations, the District Court found significant that Time W arner's own judgment and the written job descriptions issued by both Time Warner and New Channels suggested that climbing was an essential job requirement, and that Skerski himself admitted in his deposition that as an installer technician he spent a considerable portion of his time climbing. The court further dismissed Skerski's reliance on evidence that another co-worker spent most of his time working on underground work, explaining that "Skerski does not . . . introduce any evidence suggesting that this co-worker never climbs." Id. at 8 (emphasis in original).

Looking to the three factors included in S 1630.2(n)(2), it is evident that two are not present in this case as installer technicians are not hired solely to climb or even because of their climbing expertise. See 29 C.F .R. S 1630.2(n)(2)(i) and (iii). On the other hand, the other factor supports the District Court's conclusion that climbing is an essential function of the job of installer technician. Ther e is evidence to suggest that Time Warner employs a limited number of installer technicians in Skerski's work area-- only 7 or 8, according to Skerski -- and that this small number hampers Time Warner's ability to allow certain technicians to avoid climbing. The significance of this factor is pointed out in the Interpretive Guidance to S 1630.2(n), which explains, "if an employer has a relatively small number of available employees for the volume of work to be per formed, it may be necessary that each employee perfor m a multitude of different functions. Ther efore, the performance of those functions by each employee becomes mor e critical and the options for reorganizing the work become more limited." EEOC Interpretive Guidance, 29 C.F .R. pt. 1630, App. 1630.2(n).

But this is only one of the three factors. Mor eover, consideration of the seven evidentiary examples included in S 1630.2(n)(3) suggests caution against any pr emature

10

determination on essential functions as at least some of them lean in Skerski's favor. Of course, as r equired by S 1630.2(n)(3)(i), we owe some deference to Time Warner and its own judgment that climbing is essential to the installer technician position. And the written job descriptions, as the District Court noted, "clearly identify climbing as a job requirement." Skerksi, slip op. at 7. However, describing climbing as a requir ement is not necessarily the same as denominating climbing as an essential function. In fact, the job descriptions pr epared by both New Channels and Time Warner list various duties and responsibilities under the heading "Essential Functions," but neither identifies climbing as"essential."3 Instead, New Channels includes climbing under the heading "Physical Tasks," app. at 143, and Time Warner includes climbing under "Special Skills[ ]" and "Physical Requirements," app. at 147. Although "may climb poles" is listed as an aspect of one of Time War ner's essential functions, the failure of both job descriptions to list "climbing" under the heading "Essential Functions" suggests one could view climbing as a useful skill or method to perform the essential functions of the job but that it is not itself an essential function of the installer technician position.

The distinction was made by Representative Fish when he introduced amendments to the bill that became the ADA relating to the definition of a "qualified individual" and the reasonable accommodation requirement and which were incorporated into the ADA. In his comments, he stated:

> [T]he essential function requirement focuses on the
> desired result rather than the means of accomplishing
> it. For example, in one case under the Rehabilitation

_____

3. The nine essential functions set forth in T ime Warner's job description
are set forth in the text. New Channels listed the following as "Essential Job Functions" in its written description of Skerski's installer technician
position: (1) "Must possess a valid driver's license, have ability to drive
company vehicles and have a good driving recor d;" (2) "Public relations skills to the extent that they are needed for verbal and written communication of both technical and non-technical information to customers and fellow employees;" and (3) "Must have mechanical ability to use small tools." App. at 143.

11

Act, the employer required each employee to be able to perform the job with both arms. Prewitt v. U.S. Postal Service, 662 F.2d 292 (5th Cir. 1981). The plaintiff was unable to do this because his disability resulted in limited mobility in his left arm. The court found that the essential function of the job was the ability to lift and carry mail which the employee had proven that he could do, not the ability to use both arms. Moreover, the court found that the employer was requir ed to adapt the work environment to determine whether the employee with the disability could perfor m the essential requirements of the job with reasonable adaptations.

Likewise, in a job requiring the use of a computer, the essential function is the ability to access, input, and retrieve information from the computer. It is not essential that the person be able to use the keyboar d or visually read the computer screen, if the provision of adaptive equipment or software would enable the person with the disability -- for example, impair ed vision or limited hand control -- to contr ol the computer and access the information. The r elevant question would be whether the acquisition of the equipment would be a reasonable accommodation, given the factors to be considered in making that determination.

136 Cong. Rec. 11,451 (1990).

Among the facts and circumstances relevant to each case is, of course, the employee's actual experience as well as that of other employees. See 29 C.F.R. S 1630.2(n)(3)(iv), (vi) and (vii). It is undisputed that from the time Skerski began as an installer technician in 1982 until the time he was diagnosed with his panic disorder in 1993, a significant portion of his job responsibilities requir ed climbing. There is a basis to find that Skerski spent appr oximately 50% of his time before his 1993 diagnosis perfor ming work that required climbing. However, for the three and a half years after his diagnosis in which he continued to work as an installer technician, Skerski performed virtually no overhead work at all. He only did so when he was "trying to see if [he] could do it." App. at 375. As we noted above, Time Warner conceded that Skerski continuously received

12

high ratings for his performance during this time. Skerski testified at his deposition that there always was enough underground work to do, that he always worked 40-hour weeks and even worked enough to earn a couple thousand dollars per year in overtime, and that he had never experienced problems at work because of his panic disorder until Hanning became his supervisor in the fall of 1996.

For further support, Skerski points to the experience of one of his co-workers, Bill Bajnowski, who allegedly worked almost exclusively on underground assignments. We are unable to give that experience much weight because Bajnowski, unlike Skerski, was never put on "modified" duty, app. at 369, and Skerski admitted that no other installer technicians had ever been restricted from overhead work like he was.

Skerski argues that his own experience exemplifies that no negative consequences resulted from his failure to perform the climbing function of his job, which is another of the illustrations listed in the regulations. See 29 C.F.R. S 1630.2(n)(3)(iv). However, ther e is support in the record for Time Warner's contention that Skerski's inability to climb caused it considerable administrative difficulties. Approximately 75%, or 170 miles, of Time Warner's cable system in the relevant area consists of overhead aerial cable, which requires installer technicians to climb to service the cables. Hanning testified that Skerski's inability to climb "made the routing process extr emely cumbersome," app. at 121, because the assignment process had to be done by hand instead of computer. He also claimed that Skerski's inability to climb necessitated the hiring of outside contract labor to meet demand, and that Skerski was not always as busy as he should have been due to his restricted work schedule. In an affidavit, Michael Flynn, Time Warner's technical operations manager in Skerski's area since January 1998, stated that the need to climb on a particular assignment may not be deter mined until the technician actually arrives at the location of the service call and it is therefore often difficult to predict whether overhead or underground work will be needed on a given day.

13

But Time Warner's evidence does not stand undisputed. Skerski testified that he always knew in advance whether an assignment would require climbing, and that his former supervisors Kane and Gruseck each had doled out assignments by hand without difficulty. Moreover, at oral argument before us, Time Warner's counsel acknowledged that he knows of no instance in which Skerski went out on assignment, only to have to return because the assignment required climbing. And Skerski claimed in his letter of November 24, 1996 that his "fellow employees, both field and office, have expressed their support in the companies [sic] accommodation with my current position." App. at 158.

In support of its argument that climbing is an essential function of Skerski's job, Time Warner relies on two district court decisions from outside this circuit. Of course, neither binds us but inasmuch as the facts presented are not dissimilar to those presented here, we consider them. In Lodderhose v. Viacom Cable, Inc., No. C96-4282 SI, 1998 WL 57025 (N.D. Cal. Jan. 27, 1998), a cable installer technician suffering from multiple sclerosis sought to continue in his job even after his doctors opined that he could not safely work at heights because of his decreased coordination and balance problems. Although the cable company transferred him to another position in the company as a field sales representative, albeit with smaller income, and offered alternate accommodations, Lodderhose sued, alleging discrimination under the ADA.

The court stated that Lodderhose did not really dispute whether climbing was an essential function of his job. See id. at *6. The unpublished opinion thus focused on whether the employer could have reasonably accommodated the plaintiff by reassigning him or restructuring his job. In contrast, Skerski has set forth evidence that places into dispute whether climbing was an essential function of his job. Specifically, Skerski argues that he did work for more than three years in his capacity as installer technician without climbing. Therefore, this case is distinguishable from Lodderhose.

Time Warner responds that the fact that Skerski was assigned underground work for three years following his

14

1993 diagnosis is not relevant to this court's determination of what functions are essential to the job of installer technician. It notes that in Allen v. Geor gia Power Co., 980 F. Supp. 470 (N.D. Ga. 1997), the court held that certain physical movements that an electrician could not per form because of a back injury were "essential functions of the position of electrician" even though the electrician had continued in his job for 30 months after the injury in a "light duty" capacity in which he perfor med none of those movements. Id. at 476. But the plaintif f in Allen based his argument that climbing was not an essential function of his job on the ground that the essential functions of his job changed when his employer switched from a supervisor-directed job-assignment system to one in which each employee was self-directed. The plaintif f readily admitted that climbing had been an essential function of his job, but argued that after the switch, "the only essential function of the position of electrician was to keep himself busy." Id. In contrast, in the case before us there was no change in the manner in which job assignments were distributed; rather, Skerski argues that climbing was never an essential function of his job.

Skerski emphasizes that the Allen plaintif f could not perform the majority of the assignments generally given to electricians whereas he can perfor m the majority of the functions of an installer technician. These ar e jury arguments. Skerski's ability to perfor m as an installer technician for more than three years without climbing might lead a reasonable juror to infer that Skerski's inability to climb had no adverse consequences for his employer, a factor that is relevant to determining what is an essential function. See 29 C.F.R.S 1630.2(n)(3)(iv). In light of the conflicting deposition testimonies of fered by Skerski and Hanning, it is unclear what effect Skerksi's inability to climb had on the servicing of Time War ner's cable system in the Coraopolis area.

We do not suggest that the District Court her e had no basis for its conclusion that climbing is an essential function of Skerski's position as installer technician or even that, if we were the triers of fact, we would not so hold. But upon reviewing the three factors listed in 29 C.F.R.

S 1630.2(n)(2) and the seven evidentiary examples provided by 29 C.F.R. S 1630.2(n)(3), it is apparent that a genuine issue of material fact exists as to whether climbing is an essential function of the job of installer technician at Time Warner. Although the employer's judgment and the written job descriptions may warrant some deference, Skerski has put forth considerable evidence that contradicts Time Warner's assertions, particularly the uncontradicted fact that following his 1993 diagnosis he worked for more than three years as an installer technician for Time Warner without ever having to perform over head work. Moreover, certain evidence suggests that during these three-plus years Skerski received repeated commendations for his work and never received any complaints from supervisors or co-workers, that is until Hanning became his immediate supervisor in the fall of 1996.

Skerski's situation is not dissimilar from that of Deane, a nurse who was unable to do heavy lifting without assistance. The hospital for which she worked contended that lifting was an essential function of her position, and that because she was unable to lift she was not a"qualified individual" under the ADA. Deane conceded that lifting was part of a nurse's duties but claimed that the heavy lifting she was restricted from doing was not an essential function of a nurse. In light of the evidence produced by both, this court en banc found that there was a genuine issue of material fact that must be decided by a jury. See Deane, 142 F.3d at 148. We therefore conclude that the District Court incorrectly decided that "reasonable jurors could only find that climbing is an essential element of the installer technician position." Skerski, slip op. at 7. Because a genuine issue of material fact exists as to whether climbing is an essential function, and therefore whether Skerksi is a "qualified individual" under the ADA, this case must be remanded for trial.

B.

"Reasonable Accommodation"

Skerski argues that even if climbing is an essential function, there is a genuine issue of material fact whether

16

he can, with a "reasonable accommodation," perform the job as an installer technician, and that summary judgment was therefore improper.

As explained earlier, a disabled employee may establish a prima facie case under the ADA if s/he shows that s/he can perform the essential functions of the job with reasonable accommodation and that the employer refused to make such an accommodation. According to the ADA, a "reasonable accommodation" includes:

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. S 12111(9)(B). The relevant r egulations define reasonable accommodations as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." 29 C.F.R. S 1630.2(o)(1)(ii).

In Walton v. Mental Health Ass'n of Southeastern Pa., 168 F.3d 661 (3d Cir. 1999), this court established that, "[o]n the issue of reasonable accommodation, the plaintiff bears only the burden of identifying an accommodation, the costs of which, facially, do not clearly exceed its benefits." Id. at 670 (quotation omitted); see also Borkowski v. V alley Central Sch. Dist., 63 F.3d 131, 138 (2d Cir. 1995). Summary judgment may be granted for a defendant only "in cases in which the plaintiff's pr oposal is either clearly ineffective or outlandishly costly." Walton, 168 F.3d at 670 (quotation omitted) (emphasis added).

If the plaintiff satisfies his or her bur den, the defendant then has the burden to demonstrate that the pr oposed accommodation creates an "undue hardship" for it. See id.; 42 U.S.C. S 12112(b)(5)(A). The ADA defines "undue hardship" as "an action requiring significant difficulty or

17

expense, when considered in light of [a series of factors]." 42 U.S.C. S 12111(10)(A). Among the factors to be considered are "the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility." 42 U.S.C. S 12111(10)(B).

The District Court found that Time War ner fulfilled its responsibilities under the ADA by reassigning Skerski to a warehouse position. The District Court noted that regulations implementing the ADA list "r eassignment to a vacant position" as a possible reasonable accommodation. See Skerski, slip op. at 9 (quoting 29 C.F .R. S 1630.2(o)(2)(ii)). The District Court found significant the fact that Skerski had previously requested a transfer to the warehouse. Skerski argues that his prior request for such a transfer does not prove that it qualifies as a reasonable accommodation. He testified in his deposition that he had requested the warehouse transfer "only under duress" because he was afraid he was going to lose his job. App. at 398. Skerski stated, "I'll take anything at that point, but I wanted my tech job." App. at 398. Therefor e, no inference that the transfer was reasonable can be drawn from Skerski's request.

The District Court apparently was also awar e that a transfer is not a reasonable accommodation if the employee is not qualified for the new position, see Mengine v. Runyon, 114 F.3d 415, 418 (3d Cir . 1997) (discussing the Rehabilitation Act, the analysis of which is equivalent to that of the ADA), as the court noted that Skerski had failed to argue that he lacked the training, education, or skills required for the warehouse position. However, there is evidence in the record that suggests that Skerski was not qualified for the warehouse position. In his deposition, Skerski stated that he lacked the necessary computer and inventory skills, and that the warehouse position was "a more physically demanding job." App. at 398. Time Warner has not contested these assertions. In light of all these outstanding factual questions, there is a genuine issue of material fact as to whether reassignment to the considerably lower-paying warehouse position ($12.50 per hour compared with the installer technician position paying $19.45 per hour) was a reasonable accommodation that satisfied the ADA.

18

Of even more significance is the fact that the EEOC's commentary to the regulations makes clear that reassignment "should be considered only when accommodation within the individual's curr ent position would pose an undue hardship." EEOC Interpr etive Guidance, 29 C.F.R. pt. 1630, App. 1630.2(o) (emphasis added). The commentary continues: "[a]n employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and ther e are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation." Id. In the instant case, it is not at all clear that a r easonable accommodation within Skerski's installer technician position was not possible.

Time Warner's defense in this case has been, in essence, that it would have been "inconvenient" for it to make the adjustments needed to retain Skerski in the position that he previously had. However, the ADA was enacted to compel employers to look deeper and more cr eatively into the various possibilities suggested by an employee with a disability. As is evident from the section on r easonable accommodation in the House Report to the Act, to which the Senate receded, it is only when the accommodation suggested would constitute an undue hardship that the employer can justify failure to accommodate in that manner. See H.R. Rep. No. 101–485 (II), at 67–68 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 349–50.

Skerski contends that Time Warner should have permitted him to use a bucket truck to work at heights as an installer technician, which would have enabled him to avoid climbing.4 Skerski testified in his deposition that, in

_____

4. Skerski also argued in the District Court that Time Warner should have permitted him to continue to work under the modified schedule in which he only performed undergr ound work. The District Court determined that this proposal would not be a reasonable accommodation. Because Skerski has not challenged this finding on appeal, we need not review the District Court's determination on this matter. We note, however, that while the fact that Time Warner previously permitted Skerski to work without performing overhead work

19

response to Hanning's demand in the fall of 1996 that he resume the climbing functions of his installer technician position, he offered to use a bucket truck instead, and that this bucket truck would enable him to perfor m all of the required overhead work. Although T ime Warner rejected this proposition, Skerski further testified that it was his understanding that Time Warner had a bucket truck available for use at the time. Time War ner does not contest Skerski's claim that he requested the use of a bucket truck before being reassigned.

At oral argument, Time War ner's counsel asserted that providing Skerski with a bucket truck would have been "clearly ineffective" in light of a letter from Skerski's treating physician, Dr. Steinber g, in which Dr. Steinberg stated that Skerski's panic disorder "pr events him from climbing ladders more than a single extension, working in a bucket truck over that height, working on the r oof of his home, . . . or approaching any height situation that increases his premature ventricular contractions or fear of having a panic attack. The fear emanates from a panic attack resulting in loss of balance and falling to the ground." App. at 150. Time War ner points out that in Lodderhose the district court accepted the defendant's similar argument that a proposed accommodation was unreasonable because the proposal r equired the plaintiff to undertake activity that his own doctors had deemed "unsafe." 1998 WL 57025, at *7.

Notwithstanding the district court's analysis in Lodderhose, we find present her e a genuine issue of material fact as to whether providing Skerksi with a bucket truck would have been a reasonable accommodation. There does not appear to have been much, if any, attention devoted to this issue in the proceedings befor e the District

_____

for three years is relevant to whether his working at heights was essential to his job, it is not relevant to whether his disability can be accommodated. This is because employers are not required to accommodate an employee by removing an essential function or restructuring a job so as to avoid it, but, rather, they are to provide an accommodation so as to enable the employee to per form such a function. See EEOC Interpretive Guidance, 29 C.F .R. pt. 1630, App. 1630.2(o).

20

Court. The court did not refer to a bucket truck in its opinion, and the only references in the r ecord to the possibility of its use were Skerski's testimony in his deposition that he proposed this alternative to Time Warner and that Time Warner owned bucket trucks at the time, and the reference in Dr. Steinber g's letter to Skerski's inability to work in a variety of jobs at heights. T ime Warner has not argued befor e us that bucket trucks were unavailable for Skerski's use or that providing Skerski with a bucket truck would have posed an undue har dship on it. In fact, Time Warner conceded at oral argument that there were three or four bucket trucks in its system, but of course it is a factual issue whether one could have been put at Skerski's disposal.

Time Warner's reliance on the letter from Dr. Steinberg may ultimately carry the day. However, as Skerski's counsel pointed out, Dr. Steinberg has never been questioned, much less cross-examined, as to whether a bucket truck was a viable alternative, or the circumstances under which Skerski might have been able to use a bucket truck. The weight to be given to Dr. Steinberg's letter is a question that should ultimately be decided by a jury.

If the jury were to find that the bucket truck was a reasonable accommodation, the reassignment to the warehouse position did not satisfy the r equirements of the ADA. See EEOC Interpretive Guidance, 29 C.F.R. pt. 1630, App. 1630.2(o). We therefore find that there is a genuine issue of material fact as to whether Time W arner provided Skerski with a reasonable accommodation, ther eby making summary judgment inappropriate.

III.

For the foregoing reasons, we will r everse the District Court's order granting summary judgment to T ime Warner on Skerski's claim under the ADA. We believe there are genuine issues of material fact as to whether climbing is an "essential function" of Skerski's job as an installer technician, and, if it is, whether Time W arner provided Skerski with a "reasonable accommodation" under the ADA.

21

Accordingly, we will remand for further pr oceedings
consistent with this opinion.

A True Copy:
Teste:

     Clerk of the United States Court of Appeals
     for the Third Circuit

22