FILED
United States Court of Appeals
Tenth Circuit

December 4, 2023

Christopher M. Wolpert
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

ROBERT HAMPTON,

      Plaintiff - Appellant,

v.

UTAH DEPARTMENT OF
CORRECTIONS; DOES 1-50,

      Defendants - Appellees.

No. 21-4127

_____

**Appeal from the United States District Court
for the District of Utah
Case No. 1:18-CV-00079-CMR**

_____

Aaron K. Bergman of Bearnson & Caldwell, LLC (Brad H. Bearnson, Wayne
K. Caldwell, and Aubri O. Thomas, with him on the briefs), Logan, Utah, for
Appellant.

Joshua D. Davidson, Assistant Utah Solicitor General, Salt Lake City, Utah,
for Appellee Utah Department of Corrections.

_____

Before **BACHARACH**, **EID**, and **ROSSMAN**, Circuit Judges.

_____

**ROSSMAN**, Circuit Judge.

_____

The Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*, forbids

employers receiving federal funds from discriminating against their

disabled employees. Robert Hampton sued his former employer, the Utah Department of Corrections (UDC or the Department), for allegedly violating the Rehabilitation Act by refusing to accommodate his disability, treating him in a disparate manner on the basis of that disability, and retaliating against him for his requested accommodation. The district court granted UDC's motion for summary judgment on all three claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's grant of summary judgment on Mr. Hampton's failure-to-accommodate claim and remand for further proceedings. We affirm the district court's grants of summary judgment on Mr. Hampton's disparate-treatment and retaliation claims.[1]

---

[1] The parties use "disparate treatment," "discrimination," and "intentional discrimination" to refer to Mr. Hampton's disparate-treatment claims. UDC Br. at 55; Appellant Br. at 6, 9. The district court referred to this cause of action as a "discrimination" claim. R.1556.

But "discrimination" under the Rehabilitation Act includes both discriminatory, intentional acts—here, disparate treatment and retaliation—and discriminatory inaction—here, failure to accommodate. 42 U.S.C. § 12112(b); see Exby-Stolley v. Bd. of Cnty. Comm'rs, 979 F.3d 784, 797 (10th Cir. 2020) (en banc). Because this case involves alleged discrimination of different kinds, we use "disparate treatment" to refer to what Mr. Hampton calls his "discrimination" claim.

# I

## A

Mr. Hampton was born missing the second and fifth digits on both hands, the result of a congenital birth condition.[2] Mr. Hampton's hand and wrist structures also lack the bones, tendons, and muscles associated with those fingers. Because of this disability, Mr. Hampton encounters difficulties "grasping, pulling, or performing other . . . functions with his hands" R.25.

In May 2016, UDC hired Mr. Hampton to serve as a Corrections Officer. Mr. Hampton had previously worked for the Arizona Department of Corrections. UDC Warden Larry Benzon hired Mr. Hampton with knowledge both of his disability and Mr. Hampton's possible future need for accommodations.

Mr. Hampton worked first as a "Utility," a nonpermanent role in which he rotated through different assignments at UDC. While the Utility role itself is generally unarmed, some of Mr. Hampton's assignments required him to carry a firearm. Indeed, the record indicates Mr. Hampton had occasion to carry a weapon almost 80 times while serving in the Utility position.

---

[2] We draw this background from the summary judgment record before the district court, noting any contested facts.

As a condition of eligibility for permanent employment, UDC requires Corrections Officers to complete the Department's Training Academy. Corrections Officers must train and qualify on UDC-approved "department-issued firearms."

Whether a weapon is "approved" by UDC for on- or off-duty use is a matter addressed by the Department's Firearms Policy (the Policy). The Policy, promulgated October 6, 2014, outlines Department "policy and procedure for the centralization, purchasing, issuance, safety, handling, restrictions, and use of firearms and ammunition." R.449. According to the document's "Rationale," "[t]he reduction of risk through safe use of firearms is the purpose of department policy and training." *Id.* at 450. The Policy

4

specifies those rifles,[3] shotguns,[4] and handguns[5] considered to be Department-approved, and which may be issued to "authorized peace officers for on or off duty use," in the case of handguns, and for use "while on duty," in the case of rifles and shotguns. *Id.* at 459-61. Across these three categories, the Policy approves for issue weapons branded by nine different

---

[3] Approved rifles are:

1. Colt/Bushmaster/DMPS [sic]/Rock River/Smith and Wesson/Sig Sauer, 5.56/.223 caliber, black finish with a barrel of not less than 10 inches, excluding the length of any flash suppressor;
2. Heckler & Koch G-36 rifle, .223 caliber, models C, K, and E, semi-automatic, black finish;
3. Heckler & Koch MP5, 9MM caliber, semi and full automatic submachine gun, 9 inch barrel, black finish, permanent or collapsible stock. (Special Operation Only);
4. Remington 40XB, .223 and .308 caliber heavy barrel bolt action rifle, five round capacity fixed magazine, wood stock, with mounted scope. (Special Operation Only); or
5. Remington PSS700, (police sniper special) .223 and .308 caliber bolt action rifle, five round capacity fixed magazine, wood stock, with mounted scope. (Special Operation Only).

R.460.

[4] The approved shotgun is a "Remington 870 12 gauge pump action shotgun, 14", 18", or 20" barrel, 4 or 7 round capacity, tube fed rounds." R.459.

[5] The approved handguns are "Glock 9mm and .40 caliber semi-automatic pistols," provided, "subcompact Glock 26 & 27 may only be carried as a primary duty weapon when working in a plain clothes assignment and approved by the staff member's RA/Warden or Division/Bureau Director/designee." R.459.

5

manufacturers. But for handguns, the Policy approves only Glock-brand firearms.

During his employment interview, Mr. Hampton informed Warden Benzon he "may need an accommodation in the weapons when he goes through the [A]cademy." *Id.* at 1516 (citation omitted). While Warden Benzon explained this request was "premature"—Mr. Hampton had not yet received an offer of employment—he told Mr. Hampton "that when he gets to the range part of the [A]cademy, he could have a conversation with Travis Knorr [then-Firearms Training Manager and Armorer], and then during that conversation they would make the determination if there was something that needed to happen or if they could help him with his qualifications." *Id.* at 1062-63.

After he was hired, and several weeks before beginning the required firearms training at the Academy, Mr. Hampton remained concerned about his ability to complete the training and qualify on the Department-approved Glock 17 because of his disability. Mr. Hampton reached out to Aaron Horsley, then serving as UDC Firearms Training Coordinator. Mr. Horsley provided Mr. Hampton a plastic gun similar to the Glock 17 and a holster for practice before the training began. On July 7, 2016, Mr. Hampton successfully completed the firearms training, qualifying to use all three

6

UDC-issued firearms: the Remington, the Colt, and the Glock.[6] He requalified, as the Department requires, in July 2017.

Though he had passed the firearms training, Mr. Hampton was still worried about using the Department-issued Glock on the job. On February 8, 2017, Mr. Hampton wrote to UDC's Human Resource Specialist, Jennifer Wilde, to request an accommodation:

> Hi Jennifer this is Officer Hampton, I need to request a reasonable accommodation for [ADA][7] purposes to use a firearm other than the glock. It is difficult for me to get a solid grip on the gun and I have to readjust my grip after two rounds and with my current position as a utility and the amount of overtime that I do at UMC I would feel better using something that I am more comfortable using. If you could call me in Uinta 3 today I would appreciate it. Thank you.

*Id.* at 1543 (first alteration in original). Ms. Wilde replied to the email the following day and then spoke with Mr. Hampton by telephone. During this call, Ms. Wilde requested some "specific information" about the proposed accommodation. *Id.* at 967-68. A few days later, Mr. Hampton sent Ms. Wilde information about a 1911 Series handgun manufactured by

---

[6] As relevant here, Mr. Hampton received a score of 21 on the Glock handgun. The score required to pass was 20.

[7] Mr. Hampton's claims on appeal arise under the Rehabilitation Act, not the Americans with Disabilities Act of 1990 (the ADA), 42 U.S.C. §§ 12111-12117. But as the Department's HR Specialist, Ms. Wilde was UDC's "ADA coordinator," tasked with "facilitat[ing]" accommodation processes. R.984-85.

Springfield Armory ("Springfield 1911"). Division Director Jerry Pope told Ms. Wilde to refer the request to Mr. Knorr, with whom Ms. Wilde left a voicemail.

Mr. Hampton received no response from UDC for two months, so in April 2017, he took it upon himself to speak with Mr. Knorr about his requested accommodation. Mr. Knorr denied Mr. Hampton's accommodation after deciding the Department "do[esn't] hand out 1911s." *Id.* at 1334. Mr. Knorr never informed Mr. Hampton of this rejection in writing.[8] Ms. Wilde likewise never provided Mr. Hampton a written denial of his February 2017 accommodation request.

While still serving in the temporary Utility role, Mr. Hampton applied for multiple permanent armed positions with the Department. He ultimately secured an unarmed permanent position as a "Timpanogos Rover" (Timp Rover) on June 17, 2017. In certain circumstances and during

---

[8] The district court found Mr. Knorr never "communicated" his rejection of the request for a Springfield 1911 to Mr. Hampton at all. R.1544.

On appeal, UDC claims Mr. Knorr verbally relayed his decision to Mr. Hampton, UDC Br. at 13 (citing R.1335-36), but Mr. Hampton denies this ever took place. R.1258 (testifying Mr. Knorr said only that he would "look into [the request] and get back with me"). In any case, there is no dispute the Department never provided Mr. Hampton with any sort of formal written denial of his request for a Springfield 1911.

some overtime assignments, however, Mr. Hampton was still required to carry a firearm.[9]

Six days into his Timp Rover assignment, Mr. Hampton became the subject of a UDC administrative review conducted by Correctional Lieutenant Jerry Price. Lieutenant Price investigated two incidents: (1) Mr. Hampton's June 22, 2017, handling of a Variable Kinetic System (VKS) gun and (2) Mr. Hampton's involvement on June 21, 2017, in the removal of a dead bird from the top of a fence.

At the end of Lieutenant Price's review, the Department found:

1. Mr. Hampton's "involvement in the VKS incident created a hazardous environment by handling a weapon that he had never been trained on";
2. Mr. Hampton's "involvement in the dead bird incident risked the safety and security of the Department by putting a dead bird over security"; and
3. Mr. Hampton "was not truthful during his interview or in his written memo" prepared as part of the investigation.

*Id.* at 1544.[10]

---

[9] We note Mr. Hampton argues the transfer to the Timp Rover position meant "carrying a weapon abruptly ended." Appellant Br. at 19 (citation omitted). Mr. Hampton does not appear to dispute he "could possibly still carry during overtime shifts"; he just argues that fact is "of little to no importance to the adverse impact of limiting Hampton from any permanent armed posts." *Id.*

[10] The parties dispute the details of these incidents. UDC claims Mr. Hampton, without proper training, handled the VKS gun, resulting in damage to the equipment. He then, according to UDC, initially lied to Lieutenant Price about his presence during the VKS incident. The dead bird

Warden Benzon then fired Mr. Hampton, apparently with no knowledge of Mr. Hampton's accommodation request.[11] According to Warden Benzon, Mr. Hampton was fired because UDC "identified some issues that would stand in the way of your successful performance." *Id.* at 1517 (citation omitted). On July 28, 2017, Director Pope wrote to Rollin Cook, UDC's Executive Director, requesting "a no rehire [designation] on Officer Robert Hampton" based on alleged "honesty issues[] and failure to follow security rules and practices." *Id.* at 1436.

Mr. Hampton appealed his termination. On January 8, 2018, the Department denied his appeal, concluding probationary employees—like

---

incident apparently involved Mr. Hampton's participation in the removal of a dead bird from a prison yard fence with inmate and chapel officer assistance while a restrained inmate waited for escort to the infirmary. Mr. Hampton, for his part, points to the presence or involvement of other UDC employees during both these incidents.

The district court found Mr. Hampton had failed to show whether these other employees "were true comparators" to Mr. Hampton—i.e., whether they were, like Mr. Hampton, still in their probationary period. R.1559. The district court acknowledged Warden Benzon's testimony "he knew about the other employee involved with the bird incident," but observed Mr. Hampton "failed to bring forth evidence to dispute [the Department's] evidence that Benzon was unaware of the other employee involved with the VKS incident at the time he made the decision to terminate him." R.1559-60 (citations omitted). Nothing in the record supports disturbing these findings on appeal.

[11] Mr. Hampton disputes Warden Benzon's testimony that he had no knowledge of the request. We address Mr. Hampton's arguments as relevant to the disparate-treatment and retaliation claims.

10

Mr. Hampton—could not avail themselves of the UDC grievance policies. Mr. Hampton then filed a charge with the United States Equal Employment Opportunity Commission pursuant to 42 U.S.C. § 2000e-5. The U.S. Department of Justice issued Mr. Hampton his notice of right to sue on April 11, 2018. *See* 29 C.F.R. § 1601.28 (2023).

**B**

On July 5, 2018, Mr. Hampton sued UDC and Does 1-50 in federal district court in Utah for violating Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794 (prohibiting discrimination by state and local departments and agencies that receive federal financial support).[12] In his complaint, Mr. Hampton alleged:

- The Department "refused to provide Mr. Hampton with a simple accommodation. . . . [which] would not have constituted a material change in the Department's operations and . . . was necessary as to Mr. Hampton's own safety while at work";

- The Department "retaliated" against him, as "Mr. Hampton was fired soon after requesting the accommodation"; and

- The Department discriminated against him with a "policy . . . against assisting disabled individuals in accordance with Section 504."

---

[12] The initial complaint also included causes of action under the ADA and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The district court granted dismissal of these claims under the Eleventh Amendment. That ruling is not on appeal.

11

R.28-29.

On January 15, 2021, UDC moved for summary judgment on Mr. Hampton's failure-to-accommodate, retaliation, and disparate-treatment claims. On September 22, 2021, the district court granted that motion. This timely appeal followed.

## II

We review a grant of summary judgment *de novo*. *See Ute Indian Tribe of Uintah & Ouray Rsrv.* v. *McKee*, 32 F.4th 1003, 1006 (10th Cir. 2022). We assess the evidence in the light most favorable to the nonmoving party—here, Mr. Hampton—and may affirm only if no genuine dispute exists as to any material fact and the movant—here, UDC—is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Ute Indian Tribe*, 32 F.4th at 1006 (citing *Tesone* v. *Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019)). In the course of this analysis, we evaluate *de novo* the district court's legal conclusions. *BNSF Ry. Co.* v. *Hiett*, 22 F.4th 1190, 1193 (10th Cir. 2022).

**A**

Mr. Hampton contends the district court erred in granting summary judgment to UDC on his failure-to-accommodate claim. As we explain, we agree.

The definition of disability discrimination in federal law includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).[13] To state a claim for failure to accommodate, Mr. Hampton must show: (1) he is disabled; (2) he is otherwise qualified for the job; and (3) he requested a plausibly or facially reasonable accommodation. *Brown* v. *Austin*, 13 F.4th 1079, 1084-85 (10th Cir. 2021). This test is not "onerous." *Norwood* v. *United Parcel Serv., Inc.*, 57 F.4th 779, 786 (10th Cir. 2023). To state this claim, Mr. Hampton does not need to establish discriminatory intent on the part of UDC because the law assumes that "any failure to provide reasonable accommodations for a disability is *necessarily* because of disability." *Lincoln* v. *BNSF Ry. Co.*, 900 F.3d 1166, 1204 (10th

---

[13] The Rehabilitation Act directs courts to assess violations using "the standards applied under . . . the [ADA]." 29 U.S.C. § 794(d). "Because the Rehabilitation Act incorporates standards from the ADA, '[c]ases decided under section 504 of the Rehabilitation Act are [] applicable to cases brought under the ADA and vice versa . . . .'" *Rivero* v. *Bd. of Regents of Univ. of N.M.*, 950 F.3d 754, 758 (10th Cir. 2020) (first alteration in original) (quoting *Woodman* v. *Runyon*, 132 F.3d 1330, 1339 n.8 (10th Cir. 1997)).

Cir. 2018) (emphasis added) (quoting *Punt* v. *Kelly Servs.*, 862 F.3d 1040, 1048 (10th Cir. 2017)).

UDC does not dispute Mr. Hampton is disabled under the applicable law or that he is otherwise qualified for the Corrections Officer position.[14] Therefore, we examine only the third element of Mr. Hampton's *prima facie* case—whether his request for a Springfield 1911 was a plausibly or facially reasonable accommodation.

The district court concluded Mr. Hampton's request was facially *un*reasonable. According to the district court, the accommodation Mr. Hampton wanted—permission to use a Springfield 1911 as a handgun— would remove an essential function of Mr. Hampton's job as a Corrections Officer:

> The undisputed facts show that under the Firearms Policy, only Department-approved handguns are issued and may be carried as a primary duty weapon and that the only Department-issued handgun types are specified models of the Glock. The . . . Firearms Policy does not contain any provision for an exception to this rule. Hampton's requested accommodation clearly violates the Firearms Policy because a Springfield [1911] is not one of the approved Department-issued handgun types.

---

[14] Before the district court, the parties disputed whether Mr. Hampton satisfied the "otherwise qualified" prong of his *prima facie* failure-to-accommodate case. The district court correctly interpreted our caselaw to conclude Mr. Hampton was otherwise qualified, and UDC does not appear to contest this determination on appeal.

14

R.1550-51 (footnote omitted). Because the requested accommodation "violated the Firearms Policy," the district concluded "it was facially unreasonable, and Hampton has failed to meet the third element of his prima facie claim." *Id.* at 1551.

On appeal, Mr. Hampton argues the district court erred in concluding he failed to meet his burden on this third element of his *prima facie* case. He challenges the district court's reliance on the Firearms Policy alone, Appellant Br. at 29-30, and the district court's conclusion the essential functions of Mr. Hampton's job "could be said to encompass a particular *brand* of equipment," *id.* at 25.

UDC urges affirmance, claiming the district court did not err in finding "an essential function" of Mr. Hampton's job to be "qualifying on and using only a Department-issued handgun." UDC Br. at 27. "The district court," according to UDC, "properly granted summary judgment" to the Department because Mr. Hampton "failed to show a facially reasonable accommodation." *Id.* at 39.

Reviewing *de novo*, we agree with Mr. Hampton.

**1**

Reasonable accommodations are "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual

15

with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii) (2023). Paraphrasing this regulatory language, we have defined *reasonable* accommodations as "those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Dansie* v. *Union Pac. R.R. Co.*, 42 F.4th 1184, 1193 (10th Cir. 2022) (quoting *Aubrey* v. *Koppes*, 975 F.3d 995, 1007 (10th Cir. 2020)).

Essential functions, in turn, are the "fundamental job duties of the employment position the individual with a disability holds or desires." 29 C.F.R. § 1630.2(n)(1). The term "does not include the marginal functions of the position." *Id.* In determining whether a function is essential, we rely, in part, on what the employer tells us those fundamental duties are. *Id.* § 1630.2(n)(3)(i). "[C]ourts must give consideration to the employer's judgment as to what functions of a job are essential." *Unrein* v. *PHC-Fort Morgan, Inc.*, 993 F.3d 873, 877 (10th Cir. 2021) (quoting *Davidson* v. *Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003)). And though a function does not become "essential" just because an employer says so, this court will usually defer to the employer's judgment absent evidence suggesting the purportedly essential function has a tangential relationship with the actual job, is inconsistently enforced, or otherwise lacks a nexus with business

16

needs. *Mason* v. *Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir.

2004); *Brown*, 13 F.4th at 1086.

**2**

The district court held "an essential function of [Mr. Hampton's] job

was that he qualify[15] on Department-issued firearms, which under the

Firearms Policy included the Glock." R.1552. In other words, the district

court concluded a fundamental duty of Mr. Hampton's job was that he use

a Glock-brand handgun. Because, instead of a Glock handgun, Mr. Hampton

wanted to use a Springfield 1911, a handgun made by a different

manufacturer not among those provided for in the Policy, the district court

---

[15] The district court first drew a fine distinction between *qualifying on* and *carrying* as essential functions, *see* R.1549, but then seemed to alternate between "carrying the Glock" as an essential function and "qualify[ing] on Department-issued firearms" as the essential function of reference. *Id.* at 1551-52.

On appeal, the parties do not draw the same distinction between "qualify" and "carry," and agree the essential function at issue is Mr. Hampton's ability to qualify *and* carry (or use) a firearm. *See, e.g.*, Appellant Br. at 30 ("[T]he essential function of [Mr. Hampton's] duties went to his ability to qualify, carry, and use a primary sidearm."); UDC Br. at 27 ("Here, qualifying on and using only a Department-issued handgun as a primary duty weapon is an essential function of the job.").

17

concluded Mr. Hampton's "requested accommodation violated the Firearms Policy . . . [and] was facially unreasonable." *Id.* at 1551.

In reaching its essential-function determination, the district court was guided *solely* by UDC's Firearms Policy. Because the Policy included only Glock platform weapons as "approved" handguns, UDC argued before the district court that permitting Mr. Hampton "to carry a handgun other than a Glock as his primary duty firearm . . . would require UDC to remove an essential function of its Corrections Officer position." *Id.* at 213. The district court agreed:

> Based on the undisputed evidence presented, the court finds the Firearms Policy's rules for the issuance of approved firearms are job-related, uniformly enforced, and consistent with business necessity and therefore entitled to deference. Because Hampton's requested accommodation violated the Firearms Policy, the court concludes that it was facially unreasonable, and Hampton has failed to meet the third element of his prima facie claim.

*Id.* at 1551.

On appeal, UDC again relies solely on the Firearms Policy to support affirmance: "[Q]ualifying on and using only a Department-issued handgun as a primary duty weapon is an essential function of the job. . . . [UDC's] Firearms Policy applies to all corrections officers and is uniformly enforced[.]" UDC Br. at 27. And UDC directs us to "weigh[] *heavily* the employer's judgment"—as expressed by the Policy—"regarding whether a

job function is essential." *Id.* at 31 (quoting *Adair* v. *City of Muskogee*, 823 F.3d 1297, 1308 (10th Cir. 2016)).

But our due regard for an employer's judgment does not require unbounded deference. Certainly, we "weigh *heavily*" an employer's explanation of the essential functions of a job. But we have also "firmly held that 'an employer may not turn every condition of employment which it elects to adopt into a job function, let alone an essential job function, merely by including it in a job description.'" *Adair*, 823 F.3d at 1308 (quoting *Hawkins* v. *Schwan's Home Serv., Inc.*, 778 F.3d 877, 889 (10th Cir. 2015)).

We conclude the district court erred in relying solely on the Firearms Policy to find Mr. Hampton's accommodation request was facially unreasonable.

"The simple fact that an accommodation would . . . permit the worker with a disability to violate a rule that others must obey [] cannot, *in and of itself*, automatically show that the accommodation is not 'reasonable.'" *US Airways, Inc.* v. *Barnett*, 535 U.S. 391, 398 (2002). To conclude otherwise, the *Barnett* Court reasoned, would prevent Congress's disability legislation from "accomplish[ing] its intended objective." *Id.* at 397. After all, most employers "will have neutral rules governing the kinds of actions most needed to reasonably accommodate a worker with a disability." *Id.* at 398. Were the fact of a neutral rule's existence enough to defeat a requested,

19

otherwise reasonable accommodation, accommodations would be rare indeed:

> Neutral office assignment rules would automatically prevent the accommodation of an employee whose disability-imposed limitations require him to work on the ground floor. Neutral "break-from-work" rules would automatically prevent the accommodation of an individual who needs additional breaks from work, perhaps to permit medical visits. Neutral furniture budget rules would automatically prevent the accommodation of an individual who needs a different kind of chair or desk.

*Id.* at 397-98.

The Supreme Court continued: In 42 U.S.C. § 12111(9)(b), Congress provided specific examples of reasonable accommodations, including "job restructuring," "part-time or modified work schedules," "acquisition or modification of equipment or devices," "and other similar accommodations." And in "providing such examples, [Congress] said nothing suggesting that the presence of [an employer's] neutral rules would create an automatic exemption" sufficient to defeat a request for one of these representative reasonable accommodations. *Barnett*, 535 U.S. at 398. "Nor," the Court observed, "ha[d] the lower courts made any such suggestion." *Id.*

We decline to extend our precedents to adopt any automatic exemption today. Instead, we apply *Barnett*'s reasoning here: that Mr. Hampton's proposed accommodation "violate[d] [UDC's] disability-neutral

rule cannot by itself place the accommodation beyond the Act's potential reach." *Id.* at 397.

**3**

Having addressed the error in *how* the district court determined carrying a Glock handgun was an essential function of Mr. Hampton's job, we turn next to the substance of the district court's conclusion.

Before the district court and this court, Mr. Hampton argues the real essential function of his job is "his ability to use and carry a primary sidearm weapon." Appellant Br. at 24. In support of affirmance, UDC reiterates "qualifying on and using only a Department-issued handgun as a primary duty weapon is an essential function of the job." UDC Br. at 27.

But in explaining the Firearms Policy, UDC argues:

- "The purpose of the Firearms Policy is 'to provide authorized staff members with policy and procedure for the centralization, purchasing, issuance, safety, handling, restrictions, and use of firearms and ammunition.'" *Id.* at 28 (quoting R.449).

- "The policy states that '[t]he use and threatened use of firearms is necessary' to prevent prison escapes, protect staff and property, resolve inmate disturbance situations, and carry out other public safety functions." *Id.* (alteration in original) (quoting R.450).

- Because "'[f]irearms and their use involve risk' to both staff in possession of firearms and to others, 'the purpose of department policy and training,' is '[t]he reduction of risk through safe use of firearms.'" *Id.* (alterations in original) (quoting R.450).

21

By the Policy's own terms, and UDC's own summary, the relevant essential function of Mr. Hampton's employment would seem to be his ability to safely carry and use a *firearm*—not just a Glock—when required. And the accommodation Mr. Hampton requested would, on its face, help him perform that essential function, enabling him to carry a firearm safely, "on equal footing with his peers." Appellant Br. at 45. At the very least, we would find Mr. Hampton has raised a genuine issue of material fact on the essential functions of his employment. Accordingly, we find the district court erred in concluding Mr. Hampton did not make a plausibly or facially reasonable accommodation request when he asked to use a Springfield 1911. Instead, we find Mr. Hampton's request for alternative equipment fits neatly within the categories of accommodations contemplated by Congress.

"In our review of the antidiscrimination laws we must be mindful of their remedial purposes . . . ." *Trainor* v. *Apollo Metal Specialties, Inc.*, 318 F.3d 976, 983 (10th Cir. 2002) (quoting *Wheeler* v. *Hurdman*, 825 F.2d 257, 262 (10th Cir. 1987)). The Rehabilitation Act proscribed discrimination like that alleged by Mr. Hampton "to empower individuals with disabilities to maximize employment, economic self-sufficiency, [and] independence," and to enhance "opportunities for individuals with disabilities . . . for competitive integrated employment." 29 U.S.C. § 701(b)(1), (2). In effectuating this goal, Congress required federal grantees to provide certain

22

reasonable accommodations. These reasonable accommodations included, as an enumerated example, the "acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(B); *see also* 29 C.F.R. § 1630.2(o)(2)(ii) (defining reasonable accommodation to include "acquisition or modifications of equipment or devices").

To find the "acquisition or modification of equipment or devices" facially *unreasonable*, when Congress used it as a paradigmatic example of a *reasonable* accommodation, would, we believe, frustrate Congress's stated ends. *Cf. Smith* v. *Midland Brake, Inc.*, 180 F.3d 1154, 1164 (10th Cir. 1999) (en banc) (declining to adopt narrow construction of statutory provision which would "do[] violence" to the regulatory framework).

We are persuaded, too, by Mr. Hampton's explanation of the reasons for his request. In assessing whether an accommodation is reasonable, this court asks *why* the accommodation is sought. We have held an "accommodation is unreasonable on its face [when] it seeks to eliminate an essential function of the . . . position." *Mason*, 357 F.3d at 1124. In *Mason*, an essential function of the job was "physical attendance in [the employer's] administration center"; because the employee wanted to work at home, the request was facially unreasonable. *Id.* In other words, when an employee's requested accommodation fundamentally changes the job, rather than helps the employee do the job, then that request may be facially unreasonable.

23

But *Mason* is wholly unlike the situation before us. Here, Mr. Hampton argues persuasively he "sought an accommodation *in furtherance* of doing his job." Appellant Br. at 34-35. He requested "acquisition . . . of equipment or devices," 42 U.S.C. § 12111(9)(B), so as to perform his job safely and "on equal footing with his peers," Appellant Br. at 43-45. This conforms to our circuit's stated "idea of accommodation," which "is to enable an employee to perform the essential functions of his job." *Mathews* v. *Denver Post*, 263 F.3d 1164, 1168 (10th Cir. 2001).

UDC's contrary arguments are unavailing. The Department claims Mr. Hampton's "accommodation request was . . . unreasonable because it was unnecessary"—Mr. Hampton had already qualified on the Glock, proving an accommodation was not needed. UDC Br. at 33. But as we have explained, we reject the district court's conclusion, reached by reference only to the Firearms Policy, that using a Department-issued Glock-platform handgun was an essential function of Mr. Hampton's employment. *See Barnett*, 535 U.S. at 397-98. Accordingly, we reject, too, UDC's characterization of Mr. Hampton's request as facially unnecessary and its dismissal of his Rehabilitation Act accommodation as Mr. Hampton "just want[ing] what he wanted, his preferred gun." UDC Br. at 34.

Instead, we conclude Mr. Hampton's request of an accommodation specifically contemplated by Congress was a plausibly reasonable request

24

sufficient to satisfy the third step of his *prima facie* case. Mr. Hampton's burden here was "not a heavy one"; he was required only to "suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Woodman* v. *Runyon*, 132 F.3d 1330, 1344 (10th Cir. 1997) (quoting *Borkowski* v. *Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2nd Cir. 1995)). Because a jury, too, could conclude Mr. Hampton's requested accommodation was plausibly reasonable, the district court erred in granting summary judgment to UDC on this claim. *See Dansie*, 42 F.4th at 1197.[16]

To be sure, it is possible the costs of providing Mr. Hampton a handgun other than a preapproved Glock could bring undue hardship to the Department. But that is a matter for the district court to address on remand, if UDC seeks to establish the affirmative defense of undue hardship.[17] *Id.* at 1193; *see also Hwang* v. *Kan. State Univ.*, 753 F.3d 1159,

---

[16] The concurrence reaches the same result by finding a triable issue exists as to the essential function of Mr. Hampton's job. While its regulatory-factor approach is consistent with our precedent, we do not understand our law to command its adoption, particularly where—as here— neither the parties nor the district court identified or applied the seven factors in 29 C.F.R. § 1630.2(n)(3).

[17] UDC invites us to "affirm on an alternative ground," namely that the Department "would still prevail on its affirmative defense of undue hardship." UDC Br. at 39.

*continued*

25

1161 (10th Cir. 2014) ("[A]n employer generally may avoid liability only if it can prove the accommodation in question imposes an undue hardship on its business."). Summary judgment, however, will remain inappropriate if Mr. Hampton "presents evidence establishing a genuine dispute" as to that defense. *Dansie*, 42 F.4th at 1193.[18]

---

An undue-hardship inquiry involves a determination of whether "an action requir[es] significant difficulty or expense, when considered in light of" many factors, including:

- "the nature and cost of the accommodation needed";
- "the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;"
- "the overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities;" and
- "the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity."

42 U.S.C. § 12111(10)(A)-(B). We decline UDC's invitation to perform a highly fact-intensive inquiry in the first instance on appeal, particularly where the relevant information to perform the undue hardship analysis is not in the record. *See Faulkenburg* v. *Weir*, 350 F. App'x 208, 210 (10th Cir. 2009) (unpublished) ("Because th[e] analysis is a highly factual inquiry, it is not appropriately handled by an appellate court in the first instance.").

[18] Because we reverse the district court on its essential-function determination, we do not reach Mr. Hampton's related argument that the

**B**

Mr. Hampton next contends the district court erred in granting summary judgment to UDC on his disparate-treatment claim. We discern no error.

To state a claim for disparate treatment under the Rehabilitation Act, Mr. Hampton must show: (1) he is disabled; (2) he is qualified to perform the essential functions of the job with or without accommodation; and (3) he suffered an adverse employment action because of his disability. *Edmonds-Radford* v. *Sw. Airlines Co.*, 17 F.4th 975, 989-90 (10th Cir. 2021). To withstand a motion for summary judgment, Mr. Hampton must raise a genuine dispute of material fact on each element of the *prima facie* case. *Hawkins*, 778 F.3d at 883. UDC does not challenge Mr. Hampton's disability or his qualification so, again, we are concerned only with the third prong of

---

district court erred in declining to consider UDC's alleged failure to engage in the interactive process that our caselaw requires of employers and employees. Appellant Br. at 45-46; *see Norwood*, 57 F.4th at 779 (describing the interactive process as "an affirmative obligation to undertake a good faith back-and-forth process between the employer and the employee, with the goal of identifying the employee's precise limitations and attempting to find a reasonable accommodation for those limitations" (quoting *Dansie*, 42 F.4th at 1193)).

While we share with the district court the view "the facts are concerning in . . . terms of the lack of communication in the interactive process and about the denial," R.1558, we do not pass on the issue and leave the district court to address it on remand.

27

the *prima facie* case. To create a triable issue on the third element of his disparate-treatment claim, Mr. Hampton was required to show he suffered (1) an adverse employment action (2) *because of* his disability. *Brown*, 13 F.4th at 1092. Mr. Hampton identifies two adverse employment actions—the termination of his employment and his assignment as a Timp Rover—which we now discuss in turn.

**1**

The district court concluded Mr. Hampton "failed to meet his burden" on causation because he was unable to show "that his disability was a determining factor in [UDC]'s actions." R.1557. On appeal, Mr. Hampton argues the district court erred in granting summary judgment to the Department on this claim because there was an "unspoken discriminatory and retaliatory policy" within UDC and because he alleges Warden Benzon knew of, and terminated him on the basis of, his disability. Appellant Br. at 10-17.[19] We cannot agree.

To show he was fired because of his disability, Mr. Hampton must "present some affirmative evidence that disability was a determining factor in the employer's decision." *Morgan* v. *Hilti, Inc.*, 108 F.3d 1319, 1323 (10th

---

[19] Mr. Hampton also argues the district court erred in concluding there was no genuine dispute as to Warden Benzon's knowledge of his accommodation request. We address this argument in our discussion of Mr. Hampton's retaliation claim.

Cir. 1997); *see also Raytheon Co.* v. *Hernandez*, 540 U.S. 44, 52 (2003) ("Liability in a disparate-treatment case 'depends on whether the protected trait . . . actually motivated the employer's decision.'") (alteration in original) (quotation omitted). At the summary judgment stage, this burden is neither "onerous" nor "perfunctory." *Morgan*, 108 F.3d at 1323-24 (citation omitted). Mr. Hampton must show the circumstances around his termination "give rise to an inference" that it was based on his disability, *Lincoln*, 900 F.3d at 1192-93 (citation omitted), and that UDC "acted with a discriminatory animus against [him] because [he] had a disability" when it fired him, *Aubrey*, 975 F.3d at 1014. This discriminatory animus may be shown either by direct or circumstantial evidence. *Tesone*, 942 F.3d at 995.

Mr. Hampton claims UDC "has an unspoken adverse action policy against disabled employees who seek an accommodation during their probationary employment period." Appellant Br. at 21. Evidence of this discriminatory policy, he argues, may be discerned from warnings not to request accommodations during the probationary period. He also points to an occasion when Warden Benzon asked Mr. Hampton's brother about Mr. Hampton's lawsuit. Appellant Br. at 11. When Mr. Hampton's brother claimed ignorance, Warden Benzon allegedly replied, "Good answer." *Id.*

29

(citing R.1445-46).[20] Mr. Hampton also directs us to the notice of separation he received at termination, which he argues evidenced discriminatory animus, relying on "issues that would stand in the way of [Mr. Hampton's] successful performance," and failing to "mention . . . misconduct." Appellant Br. at 21-22 (citation omitted).

We are unpersuaded. Recall, the third piece of Mr. Hampton's *prima facie* disparate-treatment case requires evidence Warden Benzon terminated Mr. Hampton's employment *because of* his disability. While Warden Benzon undeniably *knew of* Mr. Hampton's disability, Mr. Hampton has presented insufficient evidence to raise a triable issue as to the Warden's potential discriminatory animus.

Regardless of their admissibility, in this case, the alleged warnings to "hold off" on requesting an accommodation do not present enough evidence of discriminatory policy. Warden Benzon—the undisputed decisionmaker behind Mr. Hampton's termination—knew of Mr. Hampton's disability while interviewing Mr. Hampton. He knew, further, of Mr. Hampton's intent to request an accommodation; Warden Benzon in fact suggested how

---

[20] The district court ruled these alleged warnings were inadmissible hearsay and found Warden Benzon's "Good answer" statement irrelevant because it was allegedly made a year after Mr. Hampton's termination. R.1557-58. On appeal, Mr. Hampton contends both these determinations were erroneous. Appellant Br. at 11-12. Based on our disposition, however, we need not and do not pass on these evidentiary rulings.

Mr. Hampton should go about the accommodation process. And the notice of separation, while perhaps facially vague, capped an investigation with which Mr. Hampton was undeniably familiar. UDC persuasively argues Warden Benzon in fact overrode the objections of the Captains board to hire Mr. Hampton in the first place, with full knowledge of his disability. UDC Br. at 56. On these facts, we cannot find Mr. Hampton has presented sufficient evidence from which an inference could reasonably be drawn that disability discrimination motivated Warden Benzon's decision to terminate Mr. Hampton's employment with UDC.

## 2

Before this court, Mr. Hampton reprises the argument that his assignment as a Timp Rover was also an adverse employment action. In support, Mr. Hampton points out the Timp Rover position was unarmed but he had requested an armed post. The district court, however, concluded Mr. Hampton "failed to establish that his reassignment was an adverse employment action." R.1556.

We agree with the district court. "An adverse employment action is one that causes a significant change in employment status or benefits." *Brown*, 13 F.4th at 1092. Our circuit "liberally define[s]" the phrase "adverse employment action," *Stinnett* v. *Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003), but still requires "a significant change in employment

31

status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits," *Sanchez* v. *Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (quoting *Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 761 (1998)).

Here, Mr. Hampton was assigned from a temporary post to a permanent one. While his responsibilities were clearly altered, alteration of responsibilities alone does not make an employment action adverse. *Stinnett*, 337 F.3d at 1217 ("Actions presenting nothing beyond . . . 'alteration of responsibilities' . . . do not constitute adverse employment action.") (quoting *Sanchez*, 164 F.3d at 532). The Timp Rover assignment may not have been the position Mr. Hampton desired, but, on the record before us, we cannot conclude it represented an adverse employment action.[21]

---

[21] Even assuming the Timp Rover assignment was an adverse employment action, this *prima facie* disparate-treatment *reassignment* claim would fail on the same "because of disability" prong as the disparate-treatment *termination* claim. Where, according to UDC, 93% of the Corrections Officer positions available at UDC do not carry handguns, UDC Br. at 13, and absent record evidence as to the *who* and *why* of the reassignment decision-making process, we are not persuaded Mr. Hampton has presented the necessary affirmative evidence—direct or circumstantial—of UDC's discriminatory animus in assigning him one of those unarmed, permanent positions. *See Morgan*, 108 F.3d at 1323; *Tesone*, 942 F.3d at 995.

## C

Mr. Hampton also contends the district court erred in granting summary judgment to UDC on his retaliation claim.[22] Again, we discern no error.

To state a claim for retaliation under the Rehabilitation Act, Mr. Hampton must show: (1) he engaged in protected opposition to discrimination; (2) a reasonable employee would find the challenged action materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *EEOC* v. *C.R. Eng., Inc.*, 644 F.3d 1028, 1051 (10th Cir. 2011). UDC does not challenge the first and second elements of Mr. Hampton's *prima facie* retaliation case.

On appeal, Mr. Hampton argues the district court erred in concluding he failed to show a causal link—the third element of his *prima facie* retaliation claim. Recall, the district court found Warden Benzon—the relevant decisionmaker behind Mr. Hampton's termination—did not know about his accommodation request. Because Warden Benzon ordered "the materially adverse action" without knowledge of the "protected activity," the district court concluded Mr. Hampton could not establish the existence

---

[22] Having concluded the district court did not err in finding the Timp Rover assignment was not an adverse employment action, we analyze Mr. Hampton's retaliation claim as regards his termination only, not his reassignment.

33

of a causal connection between the accommodation request and his termination. This was error, Mr. Hampton contends, because Warden Benzon's knowledge or lack thereof is a material and genuinely disputed fact, foreclosing summary judgment.

"A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented." *EEOC* v. *Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000) (internal citation omitted). According to Mr. Hampton, Warden Benzon's knowledge of the request is material, and it is genuinely disputed because the Department "admits that its standard course of conduct was to relay the accommodation request to Warden Benzon, [so] a jury could find that such occurred, and that Benzon is lying and knew about the request." Appellant Br. at 13.

On the record presented, we must disagree. UDC correctly observes Mr. Hampton has cited no evidence in the record indicating he, Ms. Wilde, Director Pope, Mr. Knorr, or anyone else "made Benzon aware of the accommodation request" prior to the Warden's termination decision. UDC Br. at 45. Indeed, Warden Benzon testified accommodation requests "usually" filter up through Human Resources to the Division Director to the Warden, but he also explained that in certain cases they may not. R.1065-

34

66. We take Mr. Hampton's point that UDC's lack of compliance with its own processes may be troubling on its face. But Mr. Hampton's reference to the standard practice alone is insufficient to create the "genuine dispute" necessary to foreclose summary judgment on the issue. *See Horizon/CMS Healthcare*, 220 F.3d at 1190.

Mr. Hampton is correct the law requires all reasonable inferences from the record to be drawn in his favor. Appellant Br. at 6. But those inferences depend on the record actually developed. Here, the record before us does not support the inference Mr. Hampton asks us to draw—that Warden Benzon lied under oath when he said he had not been informed of Mr. Hampton's request for a Springfield 1911 before firing Mr. Hampton. *Phillips* v. *Calhoun*, 956 F.2d 949, 950 n.3 (10th Cir. 1992) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

## D

Finally, Mr. Hampton challenges the district court's "refus[al] to allow [him] to testify as an expert" regarding his disability. Appellant Br. at 46.

In an oral ruling, the district court held Mr. Hampton could not testify as an expert "as to the causes or effects of [his] disability in relation to weapons use." R.1535. On appeal, Mr. Hampton contends his experience

35

and knowledge qualified him to so testify, and the district court mistakenly

concluded otherwise.[23] Appellant Br. at 47-48. The district court did not err.

The admission of expert witness testimony is governed by Federal

Rule of Evidence 702. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579,

593-95 (1993) (discussing these factors). Nothing in the Federal Rules of

Evidence bars Mr. Hampton—a party to the litigation—from testifying as

his own expert. *See Scheidt* v. *Klein*, 956 F.2d 963, 968 n.4 (10th Cir. 1992)

(collecting cases "uphold[ing] the admission of expert testimony related by

---

[23] We agree with the district court's observation that much of Mr. Hampton's proposed testimony—to the extent it discussed his "personal experience, . . . personal situation, [and] personal observations," would be "appropriate lay testimony." R.1612.

a party"). He is, however, subject to the same admissibility standards as any other proffered expert under Rule 702.

Mr. Hampton "bears the burden of showing that [his] proffered expert[] testimony is admissible." *United States* v. *Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc) (citing *Ralston* v. *Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001)). The district court's gatekeeping role requires it to ensure the testimony is reliable and relevant. *Tudor* v. *Se. Okla. State Univ.*, 13 F.4th 1019, 1029 (10th Cir. 2021). In doing so, the district court is required to make specific findings on the record. *Adamscheck* v. *Am. Fam. Mut. Ins. Co.*, 818 F.3d 576, 586 (10th Cir. 2016). The length and detail of these findings will depend on how complicated the methodology at issue is, *Storagecraft Tech. Corp.* v. *Kirby*, 744 F.3d 1183, 1190 (10th Cir. 2014), but a cursory, absent, or "off-the-cuff" determination will not suffice, *Adamscheck*, 818 F.3d at 587-88 (citation omitted); *see also Goebel* v. *Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (finding district court abused discretion in admitting expert testimony when there was no statement in record indicating how Rule 702 analysis was performed).

We review the district court's decision to exclude the proffered expert testimony under a two-step analysis. *Tudor*, 13 F.4th at 1029.

At the first step, we review *de novo* the question of "whether the district court employed the proper legal standard and performed its gatekeeper role." *United States* v. *Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006).

Here, Mr. Hampton does not appear to suggest the district court altogether failed to perform its gatekeeper role. Nor does he contend the district court neglected to adequately record its findings. Rightly so. The district court's ruling on Mr. Hampton's proffered expert testimony made adequate reference to the parties' arguments and applied controlling caselaw to the issue. We therefore find the district court "employed the proper legal standard and performed its gatekeeper role." *Rodriguez-Felix*, 450 F.3d at 1122. We thus proceed to step two.

At the second step, we engage in a more deferential review for abuse of discretion. *Dodge* v. *Cotter Corp.*, 328 F.3d 1212, 1223 (10th Cir. 2003). Under this standard, a district court's evidentiary ruling will not be disturbed unless it is "arbitrary, capricious, whimsical or manifestly unreasonable" or when it evidences a "clear error of judgment or exceed[s] the bounds of permissible choice in the circumstances." *Atl. Richfield Co.* v. *Farm Credit Bank of Wichita*, 226 F.3d 1138, 1163-64 (10th Cir. 2000) (citations omitted). While "we review de novo the question of whether the district court applied the proper standard and actually performed its

gatekeeper role in the first instance," we "review the trial court's actual application of the standard in deciding whether to admit or exclude an expert's testimony for abuse of discretion." *Dodge*, 328 F.3d at 1223 (citing *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 139 (1997)).

In applying Rule 702, the district court concluded, "[e]ven assuming [Mr. Hampton] demonstrated specialized knowledge, skill, experience, training, or education, he . . . fail[ed]" to satisfy Rule 702's *Daubert* reliability factors. Mr. Hampton, the district court observed, "has not attempted to explain in any fashion his methods, testing, peer review, rate of error, independent research, et cetera." R.1618.

We agree. These are clear requirements of the Federal Rules, *see* Fed. R. Evid. 702(c)-(d), and the district court's adherence to them was not an abuse of discretion.

### III

We **REVERSE** the district court's grant of summary judgment to UDC on Mr. Hampton's failure-to-accommodate claim and **REMAND** for further proceedings. The district court's grants of summary judgment to UDC on Mr. Hampton's claims alleging disparate treatment and retaliation are **AFFIRMED**.

39

*Robert Hampton v. Utah Department of Corrections*, No. 21-4127
**BACHARACH**, J., concurring.

The Utah corrections department issues handguns to correctional officers and prohibits them from using other kinds of handguns while on duty. What if a correctional officer with a disability seeks an accommodation to use a different type of handgun? Federal law might require this accommodation if it wouldn't interfere with the essential functions of the job. *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1124 (10th Cir. 2004). But if the ability to safely use a department-issued handgun *is* an essential function of the job, the department could decline the requested accommodation. *See Smith v. Blue Cross Blue Shield of Kan., Inc.*, 102 F.3d 1075, 1076 (10th Cir. 1996).

To determine whether a job function is essential, we have considered a set of regulatory factors. 29 C.F.R. § 1630.2(n)(3); *see, e.g., E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 986–87 (10th Cir. 2012); *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262 (10th Cir. 2009). The district court didn't consider these factors, and the parties don't ask us to do so. But in my view, we must still apply the regulatory factors. Under those factors, a reasonable factfinder could find that the ability to safely use a department-issued handgun is not an essential function of the job. So I agree with the majority's reversal of summary judgment on Mr. Robert Hampton's claim involving a failure to provide an accommodation. But

unlike the majority, I would rely on the regulatory factors, as we have in the past. *See, e.g.*, *Picture People*, 684 F.3d at 986–87; *see also Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 894 (10th Cir. 2015) (recognizing "that we are bound to follow our own precedent and its express incorporation of the EEOC regulations").

The majority upholds the award of summary judgment on Mr. Hampton's claims involving retaliation and discrimination. On these claims, I agree with the majority both on the outcome and the rationale.

## 1. Utah's correctional officers must use the same type of handgun.

Prior to 2014, the corrections department's policy allowed officers to use their personal handguns while on duty. In 2014, however, the State audited the corrections department and recommended reconsideration of this policy. The department responded by changing its policy to require correctional officers to carry the handguns issued by the department.

The department's remaining question was the type of handgun to be issued. The department considered various brands and ultimately selected Glock handguns. With that selection, the department issued Glock handguns and prohibited correctional officers from carrying and using other handguns while on duty.

2

**2.      Mr. Hampton obtains a job as a correctional official despite his concern over the grip on Glock handguns.**

With this prohibition in place, Mr. Robert Hampton applied for a job with the corrections department. Under the existing policy, Mr. Hampton had to obtain certification of his proficiency with a Glock handgun. This requirement posed a challenge for Mr. Hampton. He had only two fingers and a thumb on each hand, and the Glock's grip was relatively large. Using a handgun with a thinner grip would have been easier. But Mr. Hampton obtained certification with a Glock and got the job.

**3.      Mr. Hampton's job sometimes required him to carry a Glock, so he asked if he could use a different handgun.**

Mr. Hampton's first role was with Utility—a temporary position involving rotation among various assignments. Some of these assignments required officers to carry a handgun. And because of the department's policy, the handgun had to be a Glock. Though Mr. Hampton had obtained certification with a Glock, he believed that a handgun with a slimmer grip would be safer because he was missing two fingers on each hand. So he asked if he could use a Springfield 1911. This request was rejected.

After the temporary Utility position ended, Mr. Hampton moved to a permanent position as a Rover at the Timpanogos buildings. As a Rover, Mr. Hampton did not need to carry a handgun for most of his shifts.

3

**4.      The corrections department fires Mr. Hampton, and he sues.**

The department later fired Mr. Hampton for violating security protocol. The firing led Mr. Hampton to sue the corrections department under the Rehabilitation Act, claiming failure to accommodate his disability, retaliation for requesting an accommodation, and discrimination based on a disability. The district court granted summary judgment to the department on all claims, and this appeal followed.

**5.      We consider de novo whether a triable fact-issue exists.**

In deciding this appeal, we conduct de novo review over the grant of summary judgment. *Sinclair Wyo. Refin. Co. v. A&B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021). This review requires us to consider the evidence and reasonable inferences in the light most favorable to Mr. Hampton. *Id.*

**6.      A genuine dispute of material fact exists on whether the ability to safely use a Glock was an essential function of the Utility job.**

The majority reverses the grant of summary judgment on Mr. Hampton's claim involving a failure to provide an accommodation. I agree with this ruling, but my reasons differ from the majority's.

In reversing the grant of summary judgment, the majority concludes that

- the issuance of a disability-neutral rule doesn't prevent scrutiny,

4

- the district court shouldn't have relied solely on the department's policy, and

- the policy's essential function is the safe use of a handgun.

Maj. Op. at 18–22.

My thinking is different: The overarching issue is whether the ability to safely use a Glock is an essential function of the Utility job when the employee is assigned to an armed position. To resolve the issue, we must conduct a fact-intensive analysis based on the regulatory factors. Those factors leave room for reasonable disagreement over the department's justification for insisting on use of a Glock (rather than another type of handgun). Given that room for disagreement, a genuine dispute of material fact exists on the reasonableness of Mr. Hampton's requested accommodation.

### a.    Regulatory factors

For liability under the Rehabilitation Act on his failure-to-accommodate claim, Mr. Hampton needed to show that

- he had suffered from a disability, had been otherwise qualified to serve as a correctional officer, and had requested a plausibly reasonable accommodation; and

- the department had refused to provide a plausibly reasonable accommodation.

*Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020). The question here is whether Mr. Hampton's requested accommodation was plausibly

5

reasonable. The accommodation wouldn't be reasonable if it eliminated an essential function of the job. *Smith v. Blue Cross Blue Shield of Kan., Inc.*, 102 F.3d 1075, 1076 (10th Cir. 1996).

The requested accommodation involved substitution of a Springfield 1911 for a Glock. The resulting question is whether this substitution would have interfered with an essential function of the job. The department urges us to answer *yes*, arguing that use of a Glock was an essential job function. Mr. Hampton urges us to answer *no*, arguing that use of a Glock was not essential because he could do his job just as well with a Springfield 1911 rather than a Glock.

Mr. Hampton bears the burden of showing that the contested job function is not essential. *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1119 (10th Cir. 2004). A function is considered "essential" if the duty is fundamental to the employee's performance of the job. *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003).

To determine whether Mr. Hampton satisfied that burden, we have recognized at least seven nonexhaustive factors:

1.  the employer's judgment on the necessity of particular job functions,

2.  any written job descriptions prepared before the employer advertised or interviewed applicants for the job,

3.  the time spent performing the function,

4.    the consequences of allowing the plaintiff to avoid the
      function,

5.    the terms of a collective bargaining agreement,

6.    the experience of past workers in the job, and

7.    the experience of current workers with similar jobs.

*Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262 (10th Cir. 2009);

29 C.F.R. § 1630.2(n)(3).

The parties didn't identify these factors, and the district court didn't apply them. Understandably, the majority follows the parties' approaches and doesn't apply these factors. In my view, however, we must apply the governing factors even when they're overlooked by the parties. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 894 (10th Cir. 2015); *see Elder v. Holloway*, 510 U.S. 510, 511–12 (1994) (stating that an appellate court should take notice of relevant legal precedent even when the parties overlook it); *accord Gonzalez v. Lee Cnty. Housing Auth.*, 161 F.3d 1290, 1303 n.39 (11th Cir. 1998) (stating that the court of appeals bears an obligation to apply the pertinent regulation sua sponte when the parties failed to proffer the regulation as relevant legal authority).

In applying these factors, we must decide how to determine whether a job function is essential. We've sometimes regarded this inquiry as mixed, containing both a legal and factual component. *See Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) ("The question of

7

whether an employee can perform the essential functions of her job is a mixed question of law and fact."). Other times, we've said that the inquiry is factual. *See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003) ("Determining whether a particular function is essential is a factual inquiry."). But even when we've described the inquiry as mixed, we've acknowledged that the inquiry is primarily factual. *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1333 (10th Cir. 1998), *overruling recognized on other grounds*, *Hermann v. Salt Lake City Corp.*, 21 F.4th 666, 677 (10th Cir. 2021); *accord Tuck v. HCA Health Servs. of Tenn.*, 7 F.3d 465, 471 (6th Cir. 1993) (stating that issues involving the essential functions of a job "are primarily factual issues"). So even if we regard the inquiry as mixed, the determination of the job's essential functions would primarily involve facts rather than law. Given the factual nature of the inquiry, disagreements over a job's essential functions are typically not suitable for summary judgment. *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014).

On this factual inquiry, the parties have not addressed the regulatory factors. But the parties' arguments fit two of the factors: (1) the employer's assessment and (2) the consequences of not requiring Mr. Hampton to perform the function.

8

**b.    The employer's assessment**

We typically defer to the employer when it specifies requirements that are job-related, uniformly enforced, and consistent with business necessity. *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 890 (10th Cir. 2015); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003). And the undisputed evidence shows that the department deemed use of a Glock as an essential function of the job.

The requirement is indisputably job-related. The department adopted this requirement following an audit. In the audit, officials had pointed out that unlike six other corrections departments in neighboring states (Arizona, Colorado, Idaho, Montana, Nevada, and Wyoming), Utah's corrections department allowed staff members to use their personal guns. Appellant's App'x vol. 2, at 506. The audit flagged advantages and disadvantages of allowing staff members to use their own guns and recommended that the corrections department "consider the appropriateness of using personal weapons as a duty weapon." *Id.* at 506–07.

The corrections department adopted this recommendation and reconsidered the policy. In reconsidering the policy, officials found that staff members had been ordering their own preferred guns, leading to disparities in quality and creating a supply of guns that no one was using or inspecting. Appellant's App'x vol. 5, at 1336. This finding led officials

9

to change the policy, providing a selection of guns that every armed officer would use. *Id.* For the officers using handguns, officials decided on Glocks because they were already being used in training. *Id.*

The new written policy stated that

- every officer had to use a department-issued handgun as the primary duty weapon and

- the only department-issued handguns would be Glocks.

Appellant's App'x vol. 2, at 454, 459. The policy was not only job-related, but also uniformly enforced, for the corrections department has never made an exception to the requirement.[1]

The policy also stemmed from the corrections department's assessment of business necessity. We might differ in how we would

---

[1]    In district court, Mr. Hampton argued that (1) officers could use whatever gun they wanted as a backup weapon and (2) Springfield 1911 guns were in the armory and issued for employee use.

The first argument stemmed from a misunderstanding of the department's policy. Officers could use a different kind of gun when working as a law-enforcement officer—not as a correctional officer, like Mr. Hampton. And even law-enforcement officers could use only department-issued guns as backup weapons. (The department didn't issue the Springfield 1911 gun to any law-enforcement officer or correctional officer.)

The second argument stemmed from a misunderstanding of the evidence. The department had some Springfield 1911s, but provided them only for competitions—not for officers' use while on duty. Appellant's App'x vol. 5, at 1300–01.

evaluate a policy that confines officials to one brand of handgun. But the department didn't act arbitrarily in adopting the requirement. The department instead followed the auditors' recommendation by studying the pros and cons of a requirement that would create uniformity.

Given these circumstances, no reasonable factfinder could question the department's reliance on its own sense of business necessity in responding to the auditors' recommendation. *See Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 98 (10th Cir. 2003) (stating that courts "will readily find a business necessity . . . when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties"). So this factor supports use of a Glock as an essential function of the job.

c.    **The consequences of not requiring Mr. Hampton to perform the function**

Mr. Hampton argues that it would be safer for him to use a Springfield 1911 rather than a Glock, and a reasonable factfinder could credit that argument. Mr. Hampton did obtain certification with a Glock, but he presented evidence that his disability made it safer for him to use a Springfield 1911 because of its slimmer grip. That evidence suggests that the requested accommodation might have improved Mr. Hampton's ability to safely perform his job, undercutting the corrections department's insistence on safety as a reason to require use of a Glock.

11

On the other hand, the department presented evidence that the Glock-only system improved the safe use of firearms in four ways:

1.  It was easier to determine if a correctional officer was carrying a department-issued handgun.

2.  It was easier to confirm that correctional officers were properly trained on their handguns.

3.  It was easier to certify proper maintenance of the handguns.

4.  If one staff member needed a weapon in an emergency, another officer could provide the staff member with an extra handgun or magazine.

Mr. Hampton's use of a Springfield 1911 could thus

*   undercut safety and

*   create a burden on the corrections department's effort to confirm compliance with the policy.

The parties' disagreement turns on a factual dispute, and the district court needed to view the evidence favorably to Mr. Hampton. *See* Part 5, above. With that favorable view, a reasonable factfinder could regard inflexible reliance on Glocks as an impediment to safety in light of Mr. Hampton's need for a slimmer grip.[2]

---

[2]    The department presents an alternative argument for affirmance based on a defense of undue hardship. The district court did not address this defense, and the majority correctly declines to address it. But in making this argument, the department contends that the requested accommodation would require retraining of 80 firearms instructors and 45 armorers. This contention could bear on what was an essential function of the job. For example, if officers were allowed to use different weapons, the department might incur a greater burden to retrain personnel. *See Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124–25 (10th Cir. 1995). But the department

12

### d.    The remaining factors

The parties' arguments do not easily fit the remaining factors, such as the time spent performing the function[3] or the experience of past or current workers in the job. So the court need not address these factors.

* * *

If a factfinder views the evidence favorably to Mr. Hampton, the regulatory factors would cut different ways. The department's judgment on the importance of uniformity weighs heavily. *Hennagir v. Utah Dep't of Corrs.*, 587 F.3d 1255, 1262 (10th Cir. 2009). But this factor isn't dispositive. *Adair v. City of Muskogee*, 823 F.3d 1297, 1308 (10th Cir. 2016); *Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1191 (10th Cir. 2003).

The department relies partly on the safety resulting from uniformity in the type of handgun used, but a factfinder could reasonably conclude that an exception for Mr. Hampton would enhance safety in light of the slimmer grip on a Springfield 1911.

---

doesn't base its argument involving essential functions on the burden of retraining instructors or armorers.

[3]    Though Mr. Hampton worked in the Utility role, he had at least 79 opportunities to carry a firearm. Appellant's App'x vol. 6, at 1484. But it is not obvious how this number matters, for there is no numerical cut-off on when a job function becomes essential. And the parties do not address the significance of the number of times that Mr. Hampton could carry a firearm. So we need not consider how often Mr. Hampton needed to carry a firearm.

Given the presence of factors cutting both ways, a triable fact-issue exists on whether use of a Glock is an essential function of the job. *See Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 280–283 (3d Cir. 2001) (concluding that summary judgment wasn't available because the factors cut both ways). If use of a Glock isn't an essential function, Mr. Hampton's proposed accommodation could be considered reasonable. The district court should thus have denied the department's motion for summary judgment on this claim.